IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 20, 2005 Session

## TINA COX, ET AL. v. SHELL OIL COMPANY, ET AL.

A Direct Appeal from the Chancery Court for Obion County
No. 18, 844     The Honorable William Michael Maloan, Chancellor

No. W2004-01777-COA-R3-CV - Filed October 31, 2005

In a class-action case, in which a settlement had been agreed to, certain members of the class were allowed to opt out of the class action based on the representations of their purported attorneys that their clients had been notified of the settlement and the proposed opt out and that they approved of same. Subsequently, litigation was commenced by the former members of the class in another jurisdiction, and the original defendants were compelled to defend the case incurring expenses, including attorney fees. The original defendants, and one of the attorneys for the class, filed motions against the purported attorneys for the opted out class members for them to show cause why they should not be held in contempt of court for making false representations to the court that resulted in the court allowing the opt out. The respondent attorneys moved to dismiss the motions filed on the basis that, if there was contempt, it was criminal only and on the basis of judicial estoppel. The trial court ruled in favor of respondent attorneys holding that any contempt was criminal and not civil and on the basis of judicial estoppel. The motions of the original defendants and a plaintiffs' attorney were dismissed. The defendants and plaintiffs' attorney have appealed. We affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J. joined.

Langdon S. Unger, Jr. of Martin, Tennessee; Paul M. O'Connor III, Seth A. Moskowitz, and Jon Avins of New York, New York for Appellants, Hoechst Celanese Corporation
Albert C. Harvey of Memphis, Tennessee and Charles Anthony Maness of Union City, Tennessee for Appellants, Shell Oil Company

Gordon Ball of Knoxville, Tennessee for Petitioner/Appellant, Gordon Ball

Leo Bearman, Jr. of Memphis, Tennessee; Robert G. McDowell and Lea Carol Owen of Nashville, Tennessee; James M. Glasgow, Jr. of Union City, Tennessee for Appellees, Richard M. Leslie, Richard M. Leslie, P.A., and Shutts and Bowen, LLP

**OPINION**

During the late 1970s and 1980s, Hoechst Celanese Corporation ("HCC") and Shell Oil Company ("Shell") participated in the manufacture and marketing of a polybutylene plumbing system that allegedly caused property damage to certain homeowners. This alleged damage gave rise to numerous lawsuits including *Cox v. Shell Oil Company* (the "*Cox* Case"), a nationwide class action suit filed in the Chancery Court for the Twenty-Seventh Judicial District on June 13, 1995. Both HCC and Shell were Defendants in this suit. The Plaintiff class (the "*Cox* Class") in the *Cox* Case was defined as:

> All persons and entities that presently own structures and/or improvements to real property in the United States of America in which there is a polybutylene plumbing system and all persons or entities that own or previously owned such structures and/or improvements to real property and incurred any cost or expense by reason of leakage from a failure, repair, or removal of, all or any portion of a "plastic water delivery system", [excluding] defendants, any parent, subsidiary, affiliate or controlled person of any defendant, the officers, directors, agents, servants, or employees of any of the same, and the members of the immediate families of any such person.

The *Cox* Class was represented by a number of attorneys (the "*Cox* Attorneys") and law firms who associated with each other and filed the Complaint in the *Cox* Case. One of the *Cox* Attorneys is Gordon Ball ("Mr. Ball," and together with HCC and Shell, "Appellants").

The *Cox* Case eventually settled and, under the *Cox* Settlement Agreement, HCC and Shell agreed–without admitting liability– to provide the qualifying *Cox* Class members relief.[1] Consistent with the requirements of Tenn. R. Civ. P. 23, the *Cox* Settlement Agreement provides that all class members are entitled to exclude themselves from the settlement. On August 24, 1995, the Chancery Court issued an order that, *inter alia*, directed all *Cox* Class members who intended to opt-out of the *Cox* Settlement to file exclusion request forms no later than October 20, 1995.

Richard M. Leslie is a Florida trial lawyer who appeared *pro hac vice* in the *Cox* Case. Richard M. Leslie, P.A. is the professional association through which Mr. Leslie practices law. Shutts & Bowen, L.L.P. is the Florida firm of which Mr. Leslie's P.A. is a member (together with Richard M. Leslie and Richard M. Leslie, P.A., the "Respondents," or "Appellees"). Mr. Leslie, along with Florida co-counsel, represented polybutylene plumbing plaintiffs in two cases that were filed at about the same time as the *Cox* Case. These cases were *Fry v. Hoechst Celanese Corporation*, Case No. 95-225-CA-B, Fla. Cir. Ct., 5th Judicial Cir. For Marion County, Florida, and *Fry v. Hoechst Celanese Corporation*, Case No. 95-6414-CA-11, Fla. Cir. Ct., 11th Judicial Cir. for

---

[1] Among other things, Shell and HCC agreed to contribute at least $950 million to provide relief.

Dade County, Florida (together with ***Fry v. Hoechst Celanese Corporation***, Case No. 95-225-CA-B, the ***"Fry*** Cases").

In the course of their representation, on October 20, 1995, the Appellees petitioned the Chancery Court for, *inter alia*, an order permitting them to exclude, from the ***Cox*** Settlement: (1) seven putative class representatives from a Florida state court litigation (the "***Fry*** Seven"); (2) nearly 9,000 Florida mobile home owners, all of whom were listed in a sealed exhibit filed with the Chancery Court; and (3) a class of all Florida mobile home owners. By Order dated May 10, 1996, the Chancery Court rejected the Appellees' attempt to opt-out not only a class of all Florida mobile home owners, but also the 9,000 Florida mobile home owners listed in the sealed exhibit. In its "Order on Motion to Clarify Opt-Out by Florida Class of Mobile Home Owners," filed May 10, 1996, the lower court explained that "...electing to opt-out of a class is a personal right of each class member. The Court finds that the request to exclude what was then an uncertified class of Florida residents was, therefore, ineffective as an opt-out." The trial court did, however, allow the Appellees fifteen days to file a brief demonstrating that they had the authority and consent from each of the nearly 9,000 Florida mobile home owners listed in the sealed exhibit (the "Florida Opt-Outs") to exclude them from the ***Cox*** Settlement.[2] On or about May 14, 1996, Appellees filed "Florida Plaintiffs' Response to Court Re Representation," which Response reads, in relevant part, as follows:

> During the April 29, 1996 hearing, the Court requested that counsel for Florida Plaintiffs submit a response regarding their representation of the owners of approximately 9,000 Florida mobile home units. In support, the Florida Plaintiffs state:
>
> 1. Undersigned counsel represents the Florida Plaintiffs in a certified class action lawsuit.... Florida counsel for the Florida Plaintiffs appeared specially in this action in October 1995, to challenge this Court's jurisdiction over the Florida Plaintiffs and to file notice to opt the Florida mobile home owners out of this action.
>
> &ast;      &ast;      &ast;
>
> 3. Undersigned counsel is co-counsel in the Florida Lawsuit with Christopher J. MacQuarrie. A true and correct copy of Mr. MacQuarrie's affidavit ("MacQuarrie Aff.") is attached and incorporated as Exhibit "A"....
>
> &ast;      &ast;      &ast;
>
> 5. The Florida mobile home owners with polybutylene plumbing systems entered into contracts of representation retaining

---

[2] The Chancery Court did permit the Appellees to exclude the ***Fry*** Seven from the settlement.

Hicks & MacQuarrie to represent them in bringing a class action lawsuit in Florida....

6. Pursuant to the terms of the contracts of representation, these Florida mobile home owners have conferred upon their Florida counsel, Mr. MacQuarrie, his law firm, and Shutts & Bowen, the undersigned co-counsel, the authority to act on their behalf in prosecuting a lawsuit against Defendants....

The Affidavit of Christopher J. MacQuarrie was attached as Exhibit A to this Response. The Affidavit reads, in pertinent part, as follows:

9. The names of the home owners represented by me, my law firm, and co-counsel Shutts & Bowen, were filed under seal in Tennessee on October 20, 1995, to opt those clients out of the Cox class, and counsel was fully authorized by these clients to file the opt out notice on their behalf.

On September 17, 1996, Appellees, on behalf of the *Fry* Seven and the Florida Opt-Outs, entered into a settlement agreement (the "Florida Opt-Out Settlement") with counsel for the *Cox* Class. The Florida Opt-Out Settlement provided, *inter alia*, that Appellees would dismiss their objections to the *Cox* Settlement, including any appeals, if the Chancery Court would recognize the validity of Appellees' efforts to exclude the Florida Opt-Outs from the *Cox* Settlement. In consideration thereof, counsel for the *Cox* Class paid Appellees $5 million, which, according to counsel for Shell, would "...be spent for the benefit of the [Florida] class, as their lawyers define the benefits...."

On October 14, 1996, the Chancery Court held a hearing to, *inter alia*, determine the validity of Appellees' efforts to exclude the Florida Opt-Outs from the *Cox* Settlement. At that hearing, counsel for HCC made the following objection:

...I would like to note on behalf of Celanese that we continue to object to Mr. Leslie's efforts to opt out these nine thousand individuals. What the Court has received, to my understanding, is a list of nine thousand individuals as well as an affidavit from Mr. Leslie stating that he and his co-counsel represent these nine thousand individuals. I don't believe that squares either with what the Court has previously stated on the record or with controlling case law.... When we last addressed this particular issue on the nine thousand...the Court ordered Mr. Leslie to make a showing that these individuals had made an individual decision not to participate in the benefits of the Cox settlement. I don't believe that showing has been made. I think, as has been mentioned before, what we have in Florida right now is a

-4-

lawsuit against Shell, Celanese, and others. However, all but one of those claims have been dismissed. The one remaining claim is a Deceptive Trade Practices Act claim, which I believe ultimately the defendants will prevail on. So, I believe before the individuals make a decision not to participate in the benefits of this settlement, they need to make an individual decision if they want to forego those [settlement benefits] and pursue litigation....

One of the *Cox* Attorneys responded to this objection as follows:

MR. BARRETT: Just briefly in rebuttal to what Mr. O'Connor said. If we accept his position, we would have to say that Mr. Leslie is a perjurer, that an officer of this Court who has been admitted pro hac vice, and certainly an officer of the Florida court, has committed a felony. We're not prepared to do that. We don't think it's so. Certainly, a person ought to have a right to act through their counsel, if, in fact, the counsel represents them.

THE COURT: Anything further, gentlemen? Mr. Leslie, you may want to speak to this, but, to be quite frank, I do have some concerns to allowing the nine thousand out of the Cox class. I feel that your attempt to opt them out is legally sufficient with the authority that you have stated that you have to act for them, but I'm concerned about these nine thousand. Have they been advised of what relief is available to them under Cox? Because I see somewhere down the road–let's look at the worse case scenario from your point of view. What if you're not successful in Florida and these nine thousand people say wait a minute, we've litigated in Florida for something we could have gotten for free in the Cox case. Doesn't that put you in a very precarious position?

MR. LESLIE: If the Court please, I don't believe so.... But remember, Your Honor, this isn't something that just happened. This happened October 20, 1995. This is when these people were opted out. We were before you on several occasions, and we also have an affidavit from my co-counsel who has represented some of these people for many, many years; and, consequently, there isn't any question in my mind but what all of these people not only know what they're doing, this is what they want to do. But if Your Honor has any worry about it, then add on Mr. O'Connor's alternative, that additional notice goes to these people who own these units in Florida.... I appreciate the Court's concern; but, again, all I can do is

represent to the Court what the clients have said to us, as their counsel....

THE COURT: Mr. Leslie, I don't want to give the impression that I'm trying to interfere with your clients' decision about whether to opt out of Cox or not. That's not the point. I just want to make sure that they're making an informed decision in doing so.

MR. LESLIE: And that's why we would have no problem to sending out an additional notice, if the Court wishes. I mean, that's up to the Court. To me, it's a little belt-and-suspenders. I don't think it needs to be done. But if the Court wishes to have it done, that's fine. To me, doing that again delays the thing for months and months....

\*                                      \*                                      \*

THE COURT: Gentlemen, unlike many of the things the Court has had to rule on, I've had time to think about this one. Considering the Orders the Court has entered in this case, especially in light of Mr. Fleming's clients and that the Court has expressed concerns on numerous occasions about the nine thousand, as I will call them, and I feel that Mr. Leslie has complied in that he has given the Court the comfort that he has the actual authority to represent them and that they have made an informed decision to opt out of the class, and class counsel appears to be satisfied also with that, I will approve your Order. I don't think any additional notice is necessary. I hope that the future proves me right that we don't have objections from class members who said that if I had known what I was giving up for what I was getting–but we will cross that bridge if we ever get there. I hope we don't. I will approve your Order.

On October 24, 1996, the Chancery Court entered an Order permitting the Appellees to exclude the Florida Opt-Outs from the *Cox* Settlement. Pursuant to the Florida Opt-Out Settlement, *supra*, on November 21, 1996, Appellees withdrew their objections to the *Cox* Settlement, and dismissed with prejudice an appeal they had filed challenging the *Cox* final order and judgment.

After excluding the Florida Opt-Outs from the *Cox* Settlement, Appellees attempted to prosecute the claims of the *Fry* Seven and the Florida Opt-Outs, and a putative class of Florida mobile home owners against HCC, Shell, and DuPont in Florida State Court in the *Fry* Cases, *supra*. Appellees were ultimately successful in obtaining relief from DuPont, which entered into a settlement agreement under which the *Fry* Plaintiffs, who were excluded from the *Cox* Settlement, were entitled to recover. Although Appellees pursued the *Fry* Plaintiffs' claims against HCC and

Shell for approximately seven years, they were ultimately unsuccessful in obtaining relief from these Defendants.[3]

On January 29, 2003, a number of the *Cox* Attorneys, including Gordon Ball, filed a "Motion to Show Cause why Richard M. Leslie, Richard M. Leslie, P.A., Shutts & Bowen LLP, and Stephen D. Scofield should not be held in Contempt of Court and Motion for an Accounting and Disgorgement" (the "Ball Motion")  This Motion asserts, *inter alia*, that Mr. Leslie "had no direct contact with the ...Florida Opt-Outs, did not inform them of their rights under the *Cox* Settlement, and was not 'fully authorized' to opt them out of the *Cox* Settlement." The *Cox* Attorneys prayed for a finding of contempt based upon Mr. Leslie's alleged misrepresentations to the trial court and for an accounting and disgorgement of the $5 million paid in connection with the Florida Opt-Out Settlement, *see supra*.  On March 7, 2003, HCC filed "Hoechst Celanese Corporation's Motion to Show Cause Why Richard Leslie, Richard M. Leslie, P.A., Shutts & Bowen LLP and Stephen D. Scofield Should not be held in Contempt of Court."  (The "HCC Motion").  Likewise, on April 3, 2003, Shell filed "Shell Oil Company's Motion to Show Cause why Richard Leslie, Richard M. Leslie, P.A. and Shutts & Bowen LLP should not be held in Contempt of Court" (the "Shell Motion," and together with the Ball Motion and the HCC Motion, the "Contempt Motions"). The Shell Motion adopts the argument set out in the HCC Motion, which reads, in relevant part, as follows:

> 32. While Celanese has not had the opportunity to depose or question each of the Florida Opt-Outs, it has learned through, among other things, discovery and hearings that Respondents: (i) did not advise each of the Florida Opt-Outs of their rights under the Cox Settlement; and (ii) did not obtain the authorization of each of the Florida Opt-Outs prior to filing exclusion requests on their behalf.
>
> \*                                     \*                                     \*
>
> 35.  The limited discovery which Celanese has been able to take regarding the Florida Opt-Out Settlement demonstrates that despite Respondents' claim to use the $5 million for the benefit of these 9,000 individuals, those individuals who Celanese has been able to question testified that they did not receive any of the $5 million. Moreover, those individuals who Celanese has been able to question testified that they were not even aware of the $5 million settlement....

---

[3] According to the HCC Motion, *see infra*, the Appellees specifically failed in their efforts to certify the Florida Litigation as a class action for litigation purposes.  In *Hoechst Celanese  Corp. v. Fry*, 753 So.2d 626, 628 (Fl. Dist. App. Ct. 2000), a Florida appellate court, *en banc*, found that "individual issues not only predominate, but overwhelm, any common issues."  The HCC Motion also claims that the Florida Litigation was dismissed as a matter of law, and that the Appellees "abandoned" the Florida Opt-Outs by withdrawing as counsel during the pendency of that Florida litigation.

36. Contrary to Respondents' representations to the Court..., Celanese has also learned that many of the Florida Opt-Outs either do not reside in, or do not own properties in, the State of Florida. Thus, these individuals were excluded from the Florida Litigation, and received no relief whatsoever even though they could have applied for full relief under the Cox Settlement.

\* \* \*

39. Under Section 29-9-102 of the Tennessee Code Annotated, the Court is empowered to hold a person or entity in contempt of court for, among other things, "willful misbehavior...in the presence of the court" or "[a]buse of, or unlawful interference with, the process or proceedings of the court"....

40. As demonstrated above, it is indisputable that Respondents submitted a brief and affidavit with the Court in which they falsely represented that they had fully advised the Florida Opt-Outs of their rights under the Cox Settlement, and that the Florida Opt-Outs had expressly authorized Respondents to file opt out requests on their behalf. Second, Respondents later advocated these misrepresentations orally to the Court.

41. Consequently, Celanese respectfully submits that the Court should find Respondents in contempt of court and impose a punishment sufficient to deter repetition of such conduct or comparable conduct by Respondents in the future....

(Citations omitted).

The Appellees filed numerous motions seeking to dismiss the Contempt Motions. One such Motion was filed on August 12, 2003 as "S & B Respondents' Motion to Dismiss the Contempt Remedies Sought by Movants Shell and Hoechst Celanese based on T.C.A. §29-9-103" and it reads, in pertinent part, as follows:

...[A]s grounds for this Motion, [Respondents] state that all of the remedies sought in the Shell and HCC Contempt Motions are outside the scope of T.C.A. §29-9-103 and are therefore unavailable to either Shell or HCC in this criminal contempt proceeding. Because it is clear as a matter of law that none of the remedies sought by Shell and HCC can be awarded by the Court, the Shell and HCC Contempt Motions should be dismissed....

In their Memorandum in Support of this Motion, the Appellees specifically state that:

> The acts alleged, if proven, would be violations of [the] Rules of the Tennessee Supreme Court; thus, under Tennessee law, they constitute criminal, not civil, contempt, and T.C.A. §29-9-105 does not apply. In its recent decision in <u>Doe v. Board of Professional Responsibility</u>, 104 S.W.3d 465 (Tenn. 2003), the Tennessee Supreme Court settled the issue of whether the violation of a rule of court constitutes civil or criminal contempt. There, a layperson filed a complaint with the Board of Professional Responsibility against an attorney and then desired to speak or write publicly about the complaint. Publicizing such a complaint is prohibited by Rule 9, Section 25 of the Rules of the Tennessee Supreme Court. The court interpreted this rule as a "standing order" of the court, <u>id</u>. at 472, and thus binding on the complainant. It further held that "a charge of contempt arising from a violation of Rule 9, Section 25 is criminal in nature," even where "brought by the complainant or respondent whose rights of confidentiality have been violated." <u>Id</u>. at 474.

(Footnotes omitted).

The Chancery Court held hearings pertaining to the Contempt Motions on March 3, 2003, May 30, 2003, July 2, 2003, September 8, 2003, October 15, 2003, and March 11, 2004. At the close of the September 8, 2003 hearing, the trial court made the following, relevant, findings from the bench:

> The heart of this matter is whether or not the proceedings are criminal or a civil contempt matter, basically whose rights are being sought to be vindicated. If it is to vindicate the integrity and power of this court, then it is a criminal matter. If it is for the benefit of the private parties to compel performance with a court order in their favor and the Court has the power to compel a person to comply with that court order, then it would be civil in nature.
>
> It's, again, important to note in this case that the five million dollars of which the petitioners seek was paid by contract between the parties and was not a part of any order of this court.
>
> This court, after a careful review of the evidence and the law in this case, especially in light of the Doe vs. Board of Professional Responsibility case, 104 S.W.3d 465, finds that this case is a criminal contempt case, that the allegations against the respondents, if they are true, then the remedy is criminal in nature and not civil.

Based upon the foregoing, the trial court granted the Appellees' motion to dismiss the civil contempt remedies sought by HCC and Shell (i.e., their reasonable attorney fees and expenses incurred in defending the *Fry* Cases). On October 1, 2003, the *Cox* Attorneys filed a motion to reconsider and, on October 8, 2003, HCC and Shell also filed their joint motion for reconsideration. In addition, on October 23, 2003, the *Cox* Attorneys filed a "Verified Motion for *Scire Facia* Writ Directing Richard M. Leslie, Richard M. Leslie, P.A., Shutts & Bowen LLP, and Shutts & Bowen to show cause why they should not be held in Civil Contempt and Motion to Void Exclusion of Florida Opt-Outs from *Cox* Settlement Class." This Motion was filed on behalf of the *Cox* Class representatives and Darlene S. Barnhill, an absent class member residing in Florida (the "Barnhill Contempt Motion"). In response to the Barnhill Contempt Motion, Appellees filed various motions for dismissal, including a March 1, 2004 Motion seeking dismissal on alleged judicial estoppel grounds (the "Judicial Estoppel Motion"). The Memorandum of Law in support of the Judicial Estoppel Motion explains the Appellees' position regarding the applicability of this doctrine as follows:

> The [Contempt Petitioners] have filed petitions in this case seeking to hold [the Respondents] in contempt of court. At the heart of the Contempt Petitioners' argument is their position that the "Opt-Out" obtained by Fry Counsel in this case was not valid because it was based on alleged material misrepresentations made to the Court in a brief filed May 15, 1996, and at a hearing held October 14, 1996. At issue is the allegation that Richard M. Leslie, Esq., deliberately misstated that he represented some 6,000 individuals named in the exclusion request submitted by Fry counsel on October 20, 1995. Contempt Petitioners claim this statement was false and...that they learned of its falsity only shortly before filing their contempt petitions in 2003.

> As [Respondents] can now demonstrate, all of the Contempt Petitioners were in possession of all the relevant facts...no later than July 28, 1998–more than four years before the first of the Contempt Petitions was filed. Since 1998, each and every one of the Contempt Petitioners has faced at least one situation requiring said Petitioner either to embrace the Cox Opt-Out as valid or to reject it as invalid. With full knowledge of all relevant facts as to the validity of the Cox Opt-Out, each and every one of the Contempt Petitioners has taken, and continues to take, actions that can only be predicated on a belief that the Cox Opt-Out is valid.

> For example, Paul M. O'Connor, III, who is counsel for HCC..., testified under oath at a hearing held May 15, 2001 (almost

two years before the contempt petitions were filed),[4] that the <u>Cox</u> Opt-Out was valid, and that the Brass Trust–comprising representatives of HCC, Shell, and <u>Cox</u> Class Counsel...–had accepted the validity of the <u>Cox</u> Opt-Out for the purpose of paying claimants....  The sworn testimony of [Mr. O'Connor]–which binds HCC, Shell, the <u>Cox</u> Class and <u>Cox</u> Class Counsel–directly contradicts the position taken by Contempt Petitioners here, that the <u>Cox</u> Opt-Out is invalid.  Such a shift in position is precluded as a matter of law in Tennessee.

Under Tennessee law, where a person has sworn to one set of facts in one proceeding, he will not be permitted to deny these facts in a subsequent proceeding.  This rule is known as the doctrine of judicial estoppel, and it will be applied even though the parties in the subsequent proceeding are different from those in the first, and even though no prejudice results from the attempted disavowal of the facts previously sworn to be true...

The trial court entered two Orders on June 15, 2004.  The first of these Orders relates to the Contempt Motions and responses filed in connection therewith.  It reads, in relevant part, as follows:

Therefore, the Court hereby finds that this is a criminal contempt proceeding and rules as follows:

\*                                  \*                                  \*

2. [Respondents'] Motion to Dismiss Accounting and Disgorgement Claims upon reconsideration is GRANTED, and, accordingly, the [*Cox* Attorneys'] Claims for Accounting and Disgorgement are hereby DISMISSED WITH PREJUDICE.

3. [Respondents'] Motion to Dismiss for Lack of Standing is GRANTED, and, accordingly, the [*Cox* Attorneys'] Show Cause Motion is hereby DISMISSED WITH PREJUDICE.

4. [Respondents'] Motion to Dismiss the Contempt Remedies Sought by Movants Shell and Celanese Based on T.C.A. §29-9-103 is GRANTED, and, accordingly, the contempt remedies sought by Shell and Celanese are hereby DISMISSED WITH PREJUDICE.

---

[4] This testimony was given in a federal bankruptcy proceeding in Texas.

The second Order entered on June 15, 2004 denied the *Cox* Attorneys' Motion to Reconsider and took the HCC and Shell Joint Motion for Reconsideration under advisement. The trial court entered several additional Orders on July 7, 2004. One of these Orders denies HCC & Shell's Joint Motion for Reconsideration and reads, in relevant part, as follows:

> Pending before the Court is Hoechst Celanes Corporation's and Shell Oil Company's Joint Motion for reconsideration, filed October 8, 2003. Based on the record before the Court; oral arguments held October 15, 2003; and the Court's ruling of June 15, 2004, this Motion is hereby DENIED.

A second Order entered on July 7, 2004 grants the Appellees' Motion to Dismiss based upon judicial estoppel. This Order reads, in pertinent part, as follows:

> (1) [Respondents'] Motion to Dismiss filed March 1, 2004 [the Judicial Estoppel Motion]... is hereby GRANTED. All pending proceedings against Shutts & Bowen LLP, Richard M. Leslie, P.A., and/or Richard M. Leslie, Esq. are hereby DISMISSED. All pending motions filed by any of the Contempt Petitioners or by Darleen [sic] Barnhill are hereby DENIED.

On July 15, 2004, Gordon Ball filed a Notice of Appeal. Mr. Ball designates himself–not the *Cox* Class or the *Cox* Attorneys–as the Appellant. Mr. Ball's Notice of Appeal indicates that he is appealing from the June 15, 2004 Order but does not indicate which of the two June 15, 2004 Orders he appeals. On August 5, 2004, HCC and Shell filed a "Notice of Joint Appeal". HCC and Shell's "Notice of Joint Appeal" reads, in relevant part, as follows:

> Please take notice that Movants Shell Oil Company d/b/a Shell Chemical Company ("Shell") and Hoechst Celanese Corporation ("Celanese") hereby jointly appeal to the Court of Appeals, Western Section, pursuant to Tennessee Rule of Appellate Procedure 16(a), from an order entered on July 7, 2004...in which the Court denied Shell's and Celanese's Joint Motion for Reconsideration of the Court's prior order dismissing the contempt remedies sought by Shell and Celanese.

The Appellants and Appellees in this matter have raised numerous issues for review. However, we perceive that there are three (3) dispositive issues in this case:

1. Whether Gordon Ball has standing.

2. Whether the trial court erred in its determination that the actions of Appellees, if contemptuous at all, constituted only criminal contempt.

3. Whether the trial court erred in dismissing HCC and Shell's motion on the basis of judicial estoppel.

All of the issues before us involve questions of law. As such, our review is *de novo* upon the record with no presumption of correctness accompanying the trial court's conclusions of law. ***See*** Tenn. R. App. P. 13(d); ***Waldron v. Delffs***, 988 S.W.2d 182, 184 (Tenn. Ct. App. 1998); ***Sims v. Stewart***, 973 S.W.2d 597, 599-600 (Tenn. Ct. App. 1998).

## Gordon Ball's Standing

Standing is a judge-made doctrine based on the idea that "[a] court may and properly should refuse to entertain an action at the instance of one whose rights have not been invaded or infringed." 59 Am.Jur.2d Parties § 30 (1987). In state law it parallels the constitutional restriction on federal court jurisdiction to "cases and controversies." U.S. Const. art. III, § 2. It has been said that no case or controversy is presented where the plaintiff lacks standing to sue. ***Gilligan v. Morgan***, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); ***see also O'Shea v. Littleton***, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). "In determining whether the plaintiff has a personal stake sufficient to confer standing, the focus should be on whether the complaining party has alleged an injury in fact, economic or otherwise, which distinguishes that party, in relation to the alleged violations, from the undifferentiated mass of the public." 32 Am.Jur.2d Federal Courts § 676 (1995).

The primary focus of a standing inquiry is on the party, not on the merits of the claims. ***Valley Forge Christian College v. Americans United for Separation of Church & State, Inc***., 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982); ***Flast v. Cohen***, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Thus, a party's standing does not depend on the likelihood of success of its claim on the merits. ***MARTA v. Metro. Gov't***, 842 S.W.2d 611, 615 (Tenn.Ct.App.1992). However, because a party's standing may hinge on the nature of its claims, a standing inquiry requires a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." ***Allen v. Wright***, 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984)

In their Motion to Reconsider, the ***Cox*** Attorney's state that their contempt petition is brought on behalf of the Florida Opt-Outs, to wit:[v19 2666]

> [***Cox*** Attorneys] ask this Court to reconsider its decision for one crucial reason: if the ruling stands and this matter is considered only as criminal contempt, then the approximately 9,000 individuals

-13-

wrongfully excluded from the *Cox* settlement (the "Opt-Outs") will be left out in the cold and forced to commence entirely new litigation in order to get the benefits they should have received years ago. This Court, by construing this proceeding as solely criminal contempt, has inadvertently taken away the very tool it needs to correct a gross injustice that took place in its courtroom, and as a result, [Respondents] will have essentially committed the perfect crime. [*Cox* Attorneys] do not believe this was the intention of this Court.

This contempt proceeding began when the [*Cox* Attorneys], who are counsel for the settlement class...filed a motion to show cause why the [Respondents] should not be held in contempt for allegedly lying to this Court in 1996. Since that time, [Respondents] have argued strenuously–and undoubtedly will in response to this motion–that this entire proceeding, including the underlying purpose behind the motions, was centered on the return of the $5 million. This is simply incorrect. While [*Cox* Attorneys] certainly contend this Court has the authority to order the return of the $5 million, the fate of the 9,000 Opt-Outs, and what impact this proceeding has on their rights, is a central issue for this Court.

In their initial "Motion to Show Cause Why [Respondents] Should Not be held in contempt of Court, and Motion for an Accounting and Disgorgement" (i.e., the Ball Motion), which is brought by the *Cox* Attorneys individually, these attorneys specifically ask the court to order Respondents to:

(2) account to this Court for funds obtained [i.e., the $5 million] as a result of the perjurious affidavit and misrepresentations; and (3) disgorge the fruits of their perjury, misrepresentations, and contempt...

The discrepancy between the Motion for Reconsideration and the Ball Motion is one noted by the trial court in the hearing on the Motion for Reconsideration, to wit:

THE COURT: Well, Mr. Ball, I've gone back–after getting your motion to reconsider, I've gone back and reviewed the pleadings in this particular case, and I see nothing in the pleadings where that the contempt is brought on behalf of the nine thousand opt outs in Florida.

In its June 15, 2004 Order, set out above, the trial court granted Appellees' Motion to Dismiss for Lack of Standing. We note that the *Cox* Attorneys, even if they purported to bring the Ball Motion on behalf of the Florida Opt-Outs, would have no standing to do so because the *Cox* Attorneys are neither members of the Florida Opt-Outs Class, nor their legal representatives.

-14-

Concerning the plea for disgorgement of the $5 million dollars paid by the *Cox* Attorneys in consideration for the Florida Opt-Out Settlement, we note that these funds were paid under a private agreement between the Respondents and the *Cox* Attorneys. Any claim that such an agreement was entered into under the guise of fraud, misrepresentation, or other untoward circumstances was not the proper subject of a contempt action in the Tennessee court as it did not involve either a lack of respect for the court as an institution or a violation of a court order

Furthermore, standing requires an injury in fact. Here, the $5 million was paid in consideration of Appellees' agreement to dismiss their objections to the *Cox* Settlement, including any appeals. Subsequently, on November 21, 1996, Appellees did withdraw their objections to the *Cox* Settlement, and dismissed with prejudice an appeal they had filed challenging the *Cox* final order and judgment. It appears, therefore, that the *Cox* Attorneys received the benefit of their bargain and that, consequently, there was no injury in fact. Therefore, the trial court's ruling that Mr. Ball has no standing is correct.

We will next address the judicial estoppel issue. As set out above, the trial court entered several orders on July 7, 2004. One of those Orders denied Shell and HCC's Joint Motion for Reconsideration. A separate Order granted Appellees' Motion to Dismiss on the grounds of judicial estoppel. The "Notice of Joint Appeal," filed by HCC and Shell specifically states that they are appealing from the July 7, 2004 Order "in which the Court denied Shell's and Celanese's Joint Motion for Reconsideration of the Court's prior order dismissing the contempt remedies sought by Shell and Celanese." Shell and HCC do not appeal from the July 7, 2004 Order granting Appellee's Judicial Estoppel Motion. Tenn. R. App. P. 3(f) states that "[t]he notice of appeal...shall designate the judgment from which relief is sought." In cases such as the one at bar, where a specific judgment was designated but the designation was erroneous or did not include issues raised by the appellant, this Court has limited its review to the specified judgment. In *Hall v. Hall*, 772 S.W.2d 432 (Tenn.Ct.App.1989), the relevant notice of appeal (as well as an earlier one that was dismissed as premature) designated a judgment of May 13, 1987, and the order denying a motion to alter or amend or for new trial and stated the appellant was appealing "from the alimony, support and property divisions" in the May 13 judgment. However, the appellant had included in the record a transcript of a contempt hearing held October 7, 1987, and in his brief the appellant challenged a contempt finding resulting from that hearing. This court determined that the October contempt order was not contemplated in either notice of appeal. Because of the designation required by Tenn. R. App. P. 3(f), "[i]nasmuch as the October, 1987, order related to a supplemental issue raised after entry of final judgment (albeit before finalized by the belated ruling on the "Motion to Amend or New Trial"), the clear and specific wording of the notices of appeal limits the issues on this appeal to the judgment designated in the notices." 772 S.W.2d at 436.

Relying on Hall, this Court has held that, when a specific judgment or order is designated in the notice of appeal, Tenn. R.App. P. 3(f) limits the scope of appellate review to the judgment or order designated. *Goad v. Pasipanodya*, No. 01A01-9509-CV-00426, 1997 WL 749462, at *2 (Tenn.Ct.App. Dec. 5, 1997). In that case, the appellants' claims against two different defendants were dismissed by the trial court in two separate orders, one dated March 17, certifying the dismissal final under Tenn. R. Civ. P. 54.02, and the second dated June 19, 1995, also certifying the dismissal as

final. The plaintiff filed a notice of appeal on July 24 stating he was appealing the trial court's June 19 order. Not only was the appeal dismissed as untimely as to each of the orders, this court also held that the appellant had not perfected an appeal of the earlier order because his notice of appeal designated only the second order. "Thus, Tenn. R.App. P. 3(f) limits his appeal to the June 19, 1995 order." *Id*., at *2.

Likewise, in *Howse v. Campbell*, No. M1999-01580-COA-R3-CV, 2001 WL 459106 (Tenn.Ct.App. May 2, 2001), this court dealt with a premature notice of appeal designating a March 11, 1999, order that dismissed one of multiple defendants. That order did not become a final, appealable order until all remaining claims among all parties were adjudicated, at which time the premature notice of appeal, which had not been dismissed, became timely. By order dated March 22, 2000, the trial court dismissed the claims against all the remaining defendants. The appellant did not file another notice of appeal. The question before the court was whether the appellant could pursue appeal of the dismissal of the defendants in the March 22, 2000 order. We determined he could not, holding that because his only notice of appeal did not state he desired to appeal from the March 22 order (and could not have, because the notice was filed months before that judgment), the notice of appeal applied only to the order it designated and this court would only consider those issues related to the dismissal of the first defendant. *Id*. at *3. In *Howse*, this Court discussed the notice purposes underlying Tenn. R.App. P. 3(f) and determined that the appellant's failure to file a second notice of appeal undermined the notice function that notices of appeal are intended to serve, leaving the other parties to guess whether he intended to appeal either, both, or neither order of dismissal. *Id*.

Based upon the authority outlined above, HCC and Shell's designation of the specific July 7, 2004 Order dismissing their Motion for Reconsideration and failure to include a notice of appeal from the July 7, 2004 Order granting Appellees' Judicial Estoppel Motion limits our review to only that Order dismissing their Motion for Reconsideration (and its underlying Order). However, since the judicial estoppel finding stands, it is dispositive in this case. Consequently, and in light of Mr. Ball's lack of standing, we pretermit the remaining issue concerning contempt.

For the foregoing reasons, we affirm the Orders of the trial court. Costs of this appeal are assessed against the Appellants, Shell Oil Company, Hoechst Celanese Corporation, Gordon Ball, and their respective sureties.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.