**Thomas D. DOSSETT**

v.

**CITY OF KINGSPORT, Tennessee.**

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Aug. 16, 2007 Session.

Nov. 28, 2007.

Permission to Appeal Denied by
Supreme Court June 16, 2008.

J. Wesley Edens, Bristol, Tennessee, and David H. Hornik, Nashville, Tennessee, for the Appellant, Thomas D. Dossett.

J. Michael Billingsley, Kingsport, Tennessee, and Joseph E. May, Mount Carmel, Tennessee, for the Appellee, City of Kingsport, Tennessee.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Thomas D. Dossett ("Plaintiff") filed suit after the Kingsport Board of Mayor and Aldermen (the "Board") showed an interest in selling city-owned real estate to private investors. Members of the Board met privately on two occasions with a potential buyer, after which the sale was considered at five public meetings and then approved by the Board. In his lawsuit, Plaintiff alleged that the ordinance by which the city disposes of surplus property is illegal; that the city violated the Open Meetings Act (the "Act"); and that a constructive trust should be imposed on the property for the use and benefit of the citizens of Kingsport. In a series of orders, the Trial Court dismissed the constructive trust issue, granted summary judgment to Defendant on the Open Meetings Act claim, and dismissed Plaintiff's challenge to the surplus property ordinance for Plaintiff's lack of standing. Plaintiff appeals the Trial Court's rulings on the standing issue and the Open Meetings Act claim. Plaintiff failed to request an *in limine* hearing or to make an offer of proof regarding his standing to challenge the ordinance, and we, therefore, find no reversible error as to this issue. We also hold that any alleged violations of the Open Meetings Act were cured by the Board's full and substantial consideration of the sale at five public meetings after the private meetings took place. We affirm.

### I. Background

This lawsuit stems from the decision of the Board to sell a parcel of land, the building on that land, and part of an adjacent parking lot in downtown Kingsport to a group of investors seeking to open a

bank there. In 2005, R. Lynn Shipley ("Shipley") approached City officials regarding the possibility of purchasing a piece of improved property on Church Circle commonly known as the "AEP Building." The City purchased the AEP Building in 2004 from the Kingsport Power Company. The AEP Building was constructed in 1932 with a classical Greek and Roman architectural design. The City used part of the AEP Building for a Customer Service Center where residents could pay their water and sewer bills. Shipley represented a group of investors who were in the process of obtaining a charter from the State of Tennessee to form a bank under the name of TriSummit Bank ("TriSummit"), and the investors were considering the AEP Building as a potential location for their new venture.

The Kingsport Regional Planning Commission (the "Planning Commission") heard a presentation at its November 17, 2005, meeting regarding TriSummit's interest in opening a bank in the AEP Building. The Planning Commission then voted unanimously to declare the AEP Building as surplus property, thus making it possible for the City to sell the property. The City's procedure for disposing of surplus real property is codified in Ordinance No. 2–462 (the "Ordinance"), which requires the Board to select one of its members to serve as the "Designated Alderman." The Designated Alderman has "the authority to dispose of surplus real property subject to final approval by the board of mayor and aldermen," including the right to sell the property privately rather than conducting a public sale or auction.

During a public work session on December 5, 2005, Hoyt Denton, who was the Board's Designated Alderman at the time, recommended that a fair market price for the property would be $800,000. On December 20, 2005, during its regular public business meeting, the Board unanimously passed on first reading an ordinance authorizing the sale of the AEP Building to TriSummit for $800,000. The Board passed the ordinance on second and final reading during a special called public meeting on January 9, 2006.

Although the Board conducted several public meetings and work sessions during late 2005 to consider TriSummit's purchase of the AEP Building, some Board members also attended two private meetings about the sale of the AEP Building. On September 14, 2005, Shipley met with City Mayor Dennis Phillips, Vice Mayor Larry Munsey, City Manager A. Ray Griffin, and Jeff Fleming, the City's assistant manager for development services, to discuss TriSummit's proposed acquisition of the AEP Building. This gathering took place without notice to the public. A second private meeting was held on November 29, 2005, at which time Shipley presented architectural plans for renovation of the AEP Building and the results of an appraisal performed for TriSummit as to the value of the AEP Building. Those present, in addition to Shipley, were Mayor Phillips, Griffin, and Denton.

On December 16, 2005, Plaintiff filed this suit against the City and Shipley, in his capacity as representative for TriSummit, and amended the complaint four days later. Plaintiff's Amended Complaint sought relief pursuant to the Declaratory Judgment Act to have the Trial Court declare the Ordinance void; find that the Board had violated the Open Meetings Act and declare the actions taken in the two private meetings with Shipley null and void; and impose a constructive trust on the AEP Building, asserting that such an action was appropriate because the City purchased the property with the understanding that it would be preserved and

held in trust for the benefit and use of the City's residents.

The Trial Court dismissed Shipley as a defendant on March 17, 2006, finding that he was not a proper party to the lawsuit. The Trial Court also dismissed the first and third counts of Plaintiff's Amended Complaint, holding that Plaintiff did not have standing to maintain an action challenging the validity of the Ordinance and that dismissal of the Plaintiff's constructive trust claim also was appropriate.

Shortly thereafter, Plaintiff filed a motion to amend his Amended Complaint and attached a proposed Second Amended Complaint. The proposed Second Amended Complaint did not name Shipley as a party to the lawsuit, leaving the City as the only defendant, and omitted Count III, the constructive trust issue. The proposed complaint also identified Plaintiff as a relator for H. Greeley Wells, Jr., district attorney general for the Second Judicial District of Tennessee, in the nature of a *quo warranto* action pursuant to Tenn.Code Ann. § 29–35–101, *et seq.* In support of his motion, Plaintiff attached a letter from Wells in which the district attorney declined to participate in the lawsuit.

Before the Trial Court ruled on Plaintiff's motion to amend, the City filed a Motion for Summary Judgment on the Open Meetings Act claim, which was the only count remaining in Plaintiff's lawsuit at that time. Following a hearing on both motions, the Trial Court granted Plaintiff's request to amend his complaint. The City then filed a motion to dismiss Count I of Plaintiff's Second Amended Complaint, alleging that Plaintiff had not met the procedural requirements to maintain a *quo warranto* action.

The Trial Court entered an order granting summary judgment to the City on Count II of Plaintiff's Second Amended Complaint, the Open Meetings Act claim.

The next day, the Trial Court granted the City's motion to dismiss Count I of Plaintiff's Second Amended Complaint, finding that Plaintiff lacked standing to challenge the validity of the Ordinance. Plaintiff appeals the Trial Court's grant of summary judgment as to Count II of his complaint and the Trial Court's dismissal of Count I. Plaintiff does not appeal the Trial Court's dismissal of Count III, the constructive trust issue.

## II. Discussion

Plaintiff has presented the following issues on appeal, which we restate as follows:

1. Whether the Trial Court erred by dismissing Plaintiff's challenge of Ordinance No. 2–462 on the basis that Plaintiff lacked standing to raise the issue.

2. Whether the Trial Court erred by granting summary judgment to the City on Plaintiff's Open Meetings Act claim.

### A. Standing to Challenge Ordinance

■■■ A trial court's determination of whether a party has standing to pursue a cause of action is a conclusion of law. *Cox v. Shell Oil Co.*, 196 S.W.3d 747, 758 (Tenn. Ct.App.2005). We review a trial court's conclusions of law *de novo* with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001).

■■■ Standing is a judge-made doctrine by which a court determines whether a party should be permitted to pursue a claim. *City of New Johnsonville v. Handley*, No. M2003–00549–COA–R3–CV, 2005 WL 1981810, at *15 n. 23 (Tenn.Ct.App. M.S., Aug. 16, 2005). We have stated that the basis for this decision is "whether the plaintiff has alleged a sufficiently personal stake in the outcome of the litigation to warrant a judicial intervention." *Wood v.*

*Metro. Nashville & Davidson County Gov't,* 196 S.W.3d 152, 157 (Tenn.Ct.App. 2005)

Plaintiff, in his Second Amended Complaint, attempted to challenge the validity of the Ordinance by means of a *quo warranto* action, with himself as relator for the district attorney general. He requested that the Trial Court declare the provisions of the Ordinance "to be null and *void ab initio* as an unlawful delegation of the discretionary authority of the Board of Mayor and Aldermen to dispose of surplus property by any means other than open competitive bidding or fully publicized public auction." The Trial Court found that Plaintiff lacked standing to challenge the validity of the Ordinance in a *quo warranto* action and, accordingly, dismissed Count I of Plaintiff's Second Amended Complaint.

*Quo warranto* is a common law remedy, which the General Assembly codified at Tenn.Code Ann. § 29–35–101, *et seq.* The procedure has been described as "a writ of inquiry as to the warrant for doing the acts of which complaint is made." *State ex rel. Wallen v. Miller,* 202 Tenn. 498, 304 S.W.2d 654, 658 (1957) (quoting 44 Am. Jur., p. 88, Sec. 2). *Quo warranto* actions generally are initiated by a district attorney general. *See* Tenn.Code Ann. § 29–35–109. The reasoning for this limitation has been explained as follows:

> In a sense—in a very important sense— every citizen and every taxpayer is interested in the enforcement of law, in the administration of law, and in having only qualified officers execute the law. But that general interest is not a private but a public interest. Being such, it is to be represented by the Attorney General or the district attorney, who are expected by themselves or those they authorize to institute quo warranto proceedings against usurpers in the same

> way that they are expected to institute proceedings against any other violator of the law. That general public interest is not sufficient to authorize a private citizen to institute such proceedings; for if it was, then every citizen and every taxpayer would have the same interest and the same right to institute such proceedings, and a public officer might, from the beginning to the end of his term, be harassed with proceedings to try his title.

*State ex rel. Wallen v. Miller,* 304 S.W.2d at 658 (quoting *Newman v. United States ex rel. Frizzell,* 238 U.S. 537, 547–48, 35 S.Ct. 881, 59 L.Ed. 1446 (1915)).

In limited circumstances, a private citizen may file a *quo warranto* action. *See* Tenn.Code Ann. § 29–35–110. However, the lawsuit still must be brought in the name of the district attorney general. *State ex rel. Wallen v. Miller,* 304 S.W.2d at 658–59. The plaintiff also is required to serve a copy of the complaint upon the district attorney general, who then must decide whether to join in the petition. *Bennett v. Stutts,* 521 S.W.2d 575, 577 (Tenn.1975). If the district attorney general does not consent to the lawsuit, the trial court then has the duty to conduct an *in limine* hearing to determine whether the plaintiff should be permitted to proceed without the district attorney general's participation. *Id.* Following the hearing, "[i]f it be determined that the District Attorney General's refusal to bring the action, or to authorize the use of his name in its institution, was improper or unjustified, or that plaintiff's case is prima facie meritorious, the trial court shall permit the action to proceed." *Id.*

In the case before us, the Trial Court did not conduct an *in limine* hearing to determine whether Plaintiff should be allowed to proceed with his *quo warranto* action. Nevertheless, the Trial Court

found that Plaintiff lacked standing to challenge the validity of the Ordinance and granted the City's Motion to Dismiss Count I of Plaintiff's Second Amended Complaint, stating that the district attorney general's "refusal to bring this action was justified and not arbitrary, as being in the best interest of the public."

 Based on our holding in *Bennett v. Stutts*, 521 S.W.2d 575, we find that the Trial Court erred by not holding an *in limine* hearing to determine whether Plaintiff had standing to maintain a *quo warranto* action after the district attorney general declined to participate in the lawsuit. However, it appears from the record before us that Plaintiff neither requested such a hearing nor made an offer of proof regarding the evidence that he would have presented if an *in limine* hearing had been held. We have stated as follows regarding the importance of an offer of proof when reviewing a trial court's decision not to hear evidence:

> An erroneous exclusion of evidence requires reversal only if the evidence would have affected the outcome of the trial had it been admitted. *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn.Ct. App.1987). Reviewing courts cannot make this determination without knowing what the excluded evidence would have been. *Stacker v. Louisville & N. R.R. Co.*, 106 Tenn. 450, 452, 61 S.W. 766 (1901); *Davis v. Hall*, 920 S.W.2d 213, 218 (Tenn.Ct.App.1995); *State v. Pendergrass*, 795 S.W.2d 150, 156 (Tenn. Crim.App.1989). Accordingly, the party challenging the exclusion of evidence must make an offer of proof to enable the reviewing court to determine whether the trial court's exclusion of proffered

evidence was reversible error. Tenn. R. Evid. 103(a)(2); *State v. Goad*, 707 S.W.2d 846, 853 (Tenn.1986); *Harwell v. Walton*, 820 S.W.2d 116, 118 (Tenn.Ct. App.1991). Appellate courts will not consider issues relating to the exclusion of evidence when this tender of proof has not been made. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn.Ct.App.2001); *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn.Ct.App.1997); *Shepherd v. Perkins Builders*, 968 S.W.2d 832, 833–34 (Tenn.Ct.App.1997).

*Thompson v. City of Lavergne*, No. M2003–02924–COA–R3–CV, 2005 WL 3076887, at *9 (Tenn.Ct.App.M.S., Nov. 16, 2005). Because Plaintiff failed to make an offer of proof regarding the evidence he would have presented in an *in limine* hearing to establish his standing to challenge the validity of the Ordinance, we hold that the Trial Court's failure to hold an *in limine* hearing on this issue was not reversible error.

### B. Summary Judgment on Open Meetings Claim

The second count of Plaintiff's Second Amended Complaint requested, *inter alia*, that the Trial Court declare any action taken at the private meetings null and void and enjoin the Board and its members from violating the Open Meetings Act in the future.[1] The Trial Court granted summary judgment to the City on this issue, finding that the private sessions on September 14, 2005, and November 29, 2005, were not "meetings" as defined in the Open Meetings Act and that, even if they were, the Board's consideration of the sale of the AEP Building during subsequent

---

1. Tennessee Code Ann. § 8–44–105 states that "[a]ny action taken at a meeting in violation of this part shall be void and of no effect; provided, that this nullification of actions taken at such meetings shall not apply to any commitment, otherwise legal, affecting the public debt of the entity concerned."

public meetings cured any violation of the Act.

In *Teter v. Republic Parking System, Inc.*, 181 S.W.3d 330 (Tenn.2005), our Supreme Court recently reiterated the standards applicable when appellate courts are reviewing a motion for summary judgment. The Court stated:

> The purpose of summary judgment is to resolve controlling issues of law rather than to find facts or resolve disputed issues of fact. *Bellamy v. Fed. Express Corp.*, 749 S.W.2d 31, 33 (Tenn.1988). Summary judgment is appropriate only when the moving party demonstrates that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04; *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn.1993). In reviewing the record, the appellate court must view all the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn.2000). And because this inquiry involves a question of law only, the standard of review is de novo with no presumption of correctness attached to the trial court's conclusions. *See Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn.2000); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995).

*Teter*, 181 S.W.3d at 337.

Tennessee law provides its citizens with extensive access to meetings conducted by its government. The Open Meetings Act, Tenn.Code Ann. § 8–44–101, *et seq.*, provides that "[a]ll meetings of any governing body are declared to be public meetings open to the public at all times, except as provided by the Constitution of Tennessee." Tenn.Code Ann. § 8–44–102(a).

The parties do not dispute that the Kingsport Board of Mayor and Aldermen is a "governing body" for purposes of the Open Meetings Act. They do, however, disagree as to whether the sessions in the City Manager's office on September 14, 2005, and November 29, 2005, were "meetings" as that term is defined in the Open Meetings Act. The General Assembly has defined the term, in part, as follows:

> "Meeting" means the convening of a governing body of a public body for which a quorum is required *in order to make a decision or to deliberate toward a decision on any matter.* "Meeting" does not include any on-site inspection of any project or program.

Tenn.Code Ann. § 8–44–102(b)(2) (emphasis added).

Plaintiff alleged that the two private sessions when Shipley met with a group of city officials, including two members of the Board (Mayor Phillips and one alderman at each meeting), violated the Open Meetings Act. The City denied that the episodes were "meetings" within the definition of the Act because no deliberations occurred, no decisions were made by Board members at that time, and that these were discussions only for information gathering or fact finding purposes. In the alternative, the City asserted that any alleged violation of the Act caused by the private meetings was cured by the subsequent public meetings at which the proposed sale was considered.

A chronology of the events leading to the City's sale of the AEP Building is reflected in the record as follows:

On August 9, 2005, the Board discussed the City's use of the AEP Building at its annual retreat. This meeting was open to the public. Mayor Phillips told other Board members that he had been approached by

two people who were interested in purchasing the AEP Building.

On September 14, 2005, Shipley met privately with City Manager Griffin, Mayor Phillips, Vice Mayor Munsey, and Jeff Fleming, the City's assistant manager for development services, to discuss TriSummit's proposed acquisition of the AEP Building. This gathering took place without notice to the public.

At a Board work session on October 31, 2005, Shipley presented information to the Board about TriSummit's interest in purchasing and restoring the AEP Building for use as a bank. This work session was public. The minutes of the Board meeting described the Board's discussion regarding sale of the property following Shipley's comments:

> The BMA discussed the pros and cons of selling the building. The positives included that the cost of updating the building for the City's use is prohibitive, selling would put the property back on the City's tax rolls, and the City would maintain control of the park.[2] The downside is the emotional attachment of many citizens to the history of the building and relocating both the Payment Center and the Farmers Market. The Board agreed to move forward expeditiously with sale of the building, by declaring it surplus and working through the proper process to put the building up for sale. Designated Alderman Denton will proceed to get estimates of what income could be realized and costs associated with moving the Payment Center, and present that information at the next work session for a final decision to be made.

The Board met again in another public work session on November 14, 2005, at which time Denton presented a list of reasons for and against selling the AEP Building. According to minutes from the work session, "Mayor Phillips pointed out that the [Board] has a pressing need to make a decision on this issue based on the likely possibility of a potential buyer for the building if it is determined to be the best move on behalf of the City to sell the building." Shipley presented the Board with sketches of proposed renovations to the AEP Building, should TriSummit be allowed to purchase and renovate the property. Shipley also told the Board that time was of the essence in securing a location for the bank. The minutes reflect the following activity at the work session:

> After further Board discussion, there appeared to be support for moving forward with the sale of the AEP building. City Attorney Mike Billingsley remarked that this issue is scheduled to be discussed at the Planning Commission meeting on Thursday, November 17, 2005. Based on the Planning Commission's recommendation, Designated Alderman Denton can move forward with negotiating a fair market price for the property and a formal resolution will be brought for the [Board]'s consideration at the first regular meeting in December.

During its November 17 meeting, the Planning Commission voted unanimously to declare the AEP Building surplus property, thus making it possible for the City to sell the property.

A second private meeting with some members of the Board was held on November 29, 2005, at which time Shipley presented architectural plans for renovations to the AEP Building and the results

---

2. The property acquired from the Kingsport Power Company in 2004 included half of a park adjacent to the AEP Building. The Board had indicated that the City would retain ownership of the park, even if it opted to sell the AEP Building.

of an appraisal performed for TriSummit as to the value of the AEP Building. Those present, in addition to Shipley, were Mayor Phillips, City Manager Griffin, and Designated Alderman Denton. Denton testified that he and Mayor Phillips did not engage in deliberations during the meeting, though they did ask questions and discuss issues with Shipley at that time.

The Board met for a public work session on December 5, 2005, where Shipley gave a presentation regarding TriSummit's potential purchase of the AEP Building. Following a discussion among Board members about a fair market price for the property, Denton recommended a fair market price of $800,000 for the AEP Building. Denton explained that the two appraisals performed had valued the property at $650,000 and $670,000. The City paid $550,000 for the property the preceding year, and Denton stated that it would cost approximately $150,000 for the City to relocate its Financial Services department from its location in the AEP Building. The portion of an adjacent parking lot that would be sold with the AEP Building was valued at $100,000, Denton told the Board. Thus, Denton stated that, in his opinion, $800,000 was a fair market price for the AEP Building. Shipley indicated that $800,000 was an acceptable price for the property and that TriSummit's plan was to complete the purchase as soon as possible and then begin renovations. According to the minutes for this work session, "Mayor Phillips indicated that the [Board] needs to listen tonight to public opinion and give citizens every opportunity to change the Board's mind." Citizens then had an opportunity to comment on the proposed sale of the AEP Building. One person spoke in favor of the sale, and four people voiced opposition to the sale.[3]

The Board held its regular monthly meeting the next night, at which time it heard comments from ten citizens regarding the sale of the AEP Building. The Board then considered an "Agreement in Principle with a Prospective Purchaser of the American Electric Power Building." The minutes from this meeting reflect the following discussion:

Designated Alderman Denton explained the reasons for recommending the sale of this City property. Aldermen Shull, Marsh and Mallicote indicated that they are currently in support of the sale of this building but remain open to any reasonable proposals that include funding sources. Vice–Mayor Munsey expressed his willingness to delay the sale of this property due to the public outcry.

The agreement was approved by a vote of 6–1, with Munsey voting against the agreement to sell the property.

On December 19, 2005, the Board held a public work session, at which time City Attorney Billingsley announced that a lawsuit had been filed against the City in connection with the proposed sale of the AEP Building. The Board met in executive session to confer with its attorney, and then resumed the public meeting. Billingsley presented the Board with copies of a draft contract for the sale of the property. Shipley told the Board that TriSummit still wanted to purchase the AEP Building, and he had executed a contract on behalf of TriSummit to confirm that commitment. The Board also heard com-

---

**3.** After the public comment period ended, Plaintiff "arrived with several people requesting an audience with the BMA regarding the sale of the AEP Building." Although the minutes from this work session indicate that May-
or Phillips was willing to hear additional comments from Plaintiff, the record does not reflect whether Plaintiff was, in fact, permitted to address the Board.

ments from three citizens regarding the proposed sale.

At its regular monthly meeting on December 20, 2005, the Board heard citizen comments before considering a resolution authorizing sale of the AEP Building by the City. Shipley told the Board that Tri-Summit still wanted to purchase the property and had already tendered the earnest money to City Attorney Billingsley. Following this discussion, the Board unanimously approved the resolution on first reading.

The Board convened for a special called meeting on January 9, 2006. During this meeting, the Board again listened to comments from several citizens, and then unanimously approved on second and final reading the resolution authorizing the City's sale of the AEP Building to TriSummit.

The City does not dispute that on September 14, 2005, and November 29, 2005, two members of the Board were part of a small group of City officials that met with Shipley regarding the possibility of selling the AEP Building to TriSummit. However, the City asserts that the Board members did not "make a decision or . . . deliberate toward a decision" but instead only were gathering information and did not violate the Open Meetings Act. We need not reach this issue because we find that, even if the Board violated the Act by some members meeting with Shipley in private, these violations were cured by the Board's substantial consideration of the sale during several subsequent public meetings.

In *Neese v. Paris Special School District*, 813 S.W.2d 432 (Tenn.Ct.App.1990), we discussed the cure doctrine as follows:

> T.C.A. § 8–44–105 provides that "[a]ny action taken at a meeting in violation of this part shall be void and of no effect. . . ." We do not believe that the legislative intent of this statute was for-

ever to bar a governing body from properly ratifying its decision made in a prior violative manner. However, neither was it the legislative intent to allow such a body to ratify a decision in a subsequent meeting by a perfunctory crystallization of its earlier action. We hold that the purpose of the act is satisfied if the ultimate decision is made in accordance with the Public Meetings Act, and if it is a new and substantial reconsideration of the issues involved, in which the public is afforded ample opportunity to know the facts and to be heard with reference to the matters at issue. See *Alaska Comm. Coll. Fed. of Teachers v. University of Alaska*, 677 P.2d 886, 891 (Alaska 1984).

*Neese*, 813 S.W.2d at 436.

Thus, we must decide whether the Board engaged in "new and substantial reconsideration" of its sale of the AEP Building following the private meetings attended by Mayor Phillips, Munsey, and Denton. After the last private meeting, on November 29, 2005, the Board held five public meetings at which the proposed sale was an agenda item. During all five meetings, citizens were permitted to express their opinions regarding disposition of the AEP Building. Plaintiff attended some of these meetings and voiced his opposition to the sale on at least two occasions. Board members discussed the pros and cons of selling the AEP Building, including the cost for the City to maintain and renovate the property, relocating the payment center that was being housed in the AEP Building, the benefit of having the property back on the City's tax rolls, additional jobs created by the new bank, preservation of the historic architecture of the AEP Building, and even concerns about parking for the local churches if TriSummit purchased the property.

In *State ex rel. Akin v. Town of Kingston Springs*, No. 01–A–01–9209–CH00360, 1993 WL 339305 (Tenn.Ct.App., Sept.8, 1993), the city commission of Kingston Springs held work sessions that violated the Open Meetings Act. *Id.* at *1. During at least two work sessions, the commission considered a set of four annexation ordinances. *Id.* at *4. The commission held three public meetings following the last work session at which the ordinances were discussed. During the public meetings, the commission received public comments and subsequently adopted the annexation ordinances. *Id.* Several residents sued to invalidate the ordinances, arguing that the commission had violated the Open Meetings Act. The trial court upheld the ordinances, finding no violation of the statute. *Id.* at *2. On appeal, we held that the commission had violated the Open Meetings Act, but we concluded that the commission had cured the violations by giving new and substantial reconsideration to the annexation ordinances during the three subsequent public meetings. *Id.* at *4–5.

■ The circumstances in *State ex rel. Akin* are similar to those presented in the case at bar. After two private meetings, each of which included two members of the Board, the entire Board then met in several public meetings to consider selling the AEP Building to TriSummit. After carefully reviewing the record, including the minutes of these public meetings, we hold that the Board conclusively established that it cured the alleged violations of the Open Meetings Act by fully and fairly considering the proposed sale during its five public meetings following the last private gathering. It is undisputed that the public was afforded at these five public meetings both ample opportunity to know the facts and to be heard as to the proposed sale. It was only after these public meetings that the decision to sell the property ultimately was made. Therefore, we affirm the Trial Court's judgment on this issue.

### III. Conclusion

We affirm the decision of the Trial Court and remand for collection of the costs below. Costs on appeal are taxed against the Appellant, Thomas D. Dossett, and his surety.