# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 16, 2014 Session

## IN RE: ESTATE OF EDWARD STEPHEN McREDMOND

**Direct Appeal from the Chancery Court for Davidson County**
**No. 06-3004-IV      Russell T. Perkins, Chancellor**

---

**No. M2013-02582-COA-R3-CV - Filed November 14, 2014**

---

This appeal involves a longstanding dispute among ten siblings with respect to a family business. After years of litigation, the parties agreed to dissolve the corporation that operated the family business and sell its assets. A receiver was appointed and authorized to sell the assets. The three defendant-siblings in this case placed the highest bid for the assets, and the trial court approved the sale to those three siblings. Prior to the closing of the sale, the three siblings formed a new corporation and assigned their right to purchase the assets to the newly formed corporation. Accordingly, at closing, the receiver conveyed the assets directly to the new corporation. The new corporation began conducting business just as the family business had done in the past. One of the plaintiff siblings formed another corporation and went into direct competition with the corporation that purchased the assets of the family business. The three individual siblings filed a counterclaim against the competing sibling, alleging intentional interference with business relations, breach of fiduciary duty, and that they lost the benefit of their bargain. They also sought injunctive relief against the competing sibling. Neither of the newly formed corporations was made a party to the proceedings. Following a three-day bench trial, the trial court awarded compensatory damages to each of the three siblings and entered a permanent injunction against the competing sibling. The competing sibling appeals the trial court's order on numerous grounds. For the following reasons, we reverse the trial court's order, vacate the injunction, and dismiss the counterclaim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in part, Vacated in part and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. McCLARTY, J., joined.

Roger Alan Maness, Clarksville, Tennessee and Jere Robert Lee, Nashville, Tennessee, for the appellant, Louis A. McRedmond.

Richard K. Smith and Matthew A. Moushon, Nashville, Tennessee, and John P. Branhan and C. David Briley, Nashville, Tennessee for the appellees, Estate of Edward Stephen McRedmond and Anita Sheridan and Linda Orsagh.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This litigation began nearly eight years ago when seven siblings sued their other three siblings over a dispute involving the family business, McRedmond Brothers, Incorporated ("MBI"). MBI was engaged in the business of buying grease, testing and blending it to certain specifications, and reselling it to customers such as manufacturers of animal food. The parties' father and uncle started the business in 1932, and it was incorporated in 1957. When the parties' father died, his shares of the corporation passed to his ten children. MBI purchased all of the shares owned by the uncle's family, so by the time of these proceedings, the ten siblings were the only shareholders of the company.

MBI's "grease plant" was located on the family farm in Davidson County. Louis McRedmond and Stephen McRedmond (the only male siblings) lived in separate homes also located on the family farm. Louis, Stephen, and their sister Anita[1] were on the board of directors and also served as the officers for MBI. However, Louis and Stephen were authorized to jointly direct how all of the other shareholders voted their shares pursuant to a shareholders agreement signed in 1996. Louis and six of his sisters instituted these proceedings in 2006, seeking to have the voting restriction in the shareholders agreement terminated due to an alleged deadlock between Louis and Stephen. Stephen and the two remaining sisters, Anita and Linda, were named as defendants.

In 2007, MBI filed a separate complaint for declaratory judgment, naming the ten siblings as defendants and seeking a judicial declaration of its rights and obligations due to the dispute over control of the company. Among other things, MBI sought to be declared "an interested party to the issues raised" in the lawsuit between the two groups of siblings in the event that the two cases were consolidated. Eventually, the chancery court entered an order in the original lawsuit consolidating the two cases. However, the order provided that the proceedings would be "bifurcated," with the court first considering the original issue of whether the voting restriction in the shareholders agreement should be terminated.

The chancery court heard proof regarding the shareholders agreement over the course

---

[1]Because many of the parties share the same last name, we will refer to the siblings by their first names for clarity. We mean no disrespect by this practice.

of two days in December 2007. At the close of the plaintiffs' proof, the defendants jointly[2] moved for involuntary dismissal pursuant to Tennessee Rule of Civil Procedure 41.02. After a separate hearing on the motion, the trial court entered an order granting the motion in part and denying the motion in part. The trial court found that the shareholders were in fact deadlocked as to the resolution of certain issues, but the court concluded that such deadlock was not a sufficient basis for terminating the shareholders agreement. The court scheduled a status conference to address further proceedings.

On April 2, 2008, an agreed order was entered in which all ten shareholders agreed that MBI should be dissolved pursuant to Tennessee Code Annotated section 48-24-301 *et seq.*, due to the deadlock.[3] The order authorized the parties to submit proposed plans for dissolution of MBI.

Louis and the other plaintiff siblings jointly submitted a proposed plan of dissolution that identified several key "issues" that, in their view, made it unlikely that a third party would submit a significant bid for the company. As the "first and most critical" issue, they noted the fact that MBI did not have a written lease for the property where the grease plant was located and from where it had historically operated. The real property had been jointly owned by Louis and Stephen as tenants in common, but it was subject to a pending partition action, filed by Louis against Stephen, and Stephen had recently conveyed his interest in the property to his co-defendant sister Linda.[4] The plaintiffs' proposal also discussed the absence of protection from post-sale competition by any of the existing owners, in addition to the fact that MBI did not have long-term contracts with third parties to ensure continued business success. Due to these and other issues, Louis and the other plaintiffs proposed a private auction between the two existing groups of shareholders. The three defendant siblings also filed a proposed plan of dissolution, which suggested that the shareholders be given an opportunity to purchase the assets via a bidding process.

---

[2]Neither group of siblings was jointly represented. Louis was represented by two attorneys, and his six co-plaintiff sisters were represented by two other attorneys. Similarly, Stephen was represented by two attorneys, and his co-defendant sisters Anita and Linda were represented by two different attorneys. Sometimes the plaintiff siblings filed pleadings jointly, and sometimes the defendant siblings filed pleadings jointly, but other times they filed separate pleadings. We will discuss separately filed pleadings to the extent they are relevant to the issues at hand, but where the plaintiffs or defendants filed joint pleadings or maintained the same position, we may refer to their positions collectively.

[3]Up to this point, the proceedings were held before then-Chancellor Richard Dinkins. Beginning with the entry of this agreed order, the proceedings were before Chancellor Russell Perkins.

[4]The partition suit apparently remains pending.

On September 22, 2008, the parties entered into an agreed order appointing Samuel K. Crocker as receiver for MBI. The order provided, in pertinent part:

> The Receiver shall immediately take control of all assets, records and business of the Company, with the understanding that the Company shall continue to conduct its ordinary course of operations, subject to oversight by the Receiver. . . .
>
> . . . .
>
> Immediately upon appointment, the Receiver shall take such steps as he deems appropriate to insure the ongoing operation of the Grease Business in an efficient manner so as to protect its value. Until the Receiver notifies them in writing to the contrary, current employees of the Company shall continue to conduct the Grease Business in the ordinary course of business, reporting directly to the Receiver. . . .
>
> . . . .
>
> Except as expressly provided above, or as authorized by the Receiver, all Parties and those acting in concert with them are hereby enjoined from taking any actions as to the business or assets of the Company, including, without limitation, entering into any contract or obligation on behalf of the Company, taking possession of any asset of the Company, or expending any funds of the Company. . . .

The order also required the receiver to propose a plan for dissolution of the company.

An "Initial Report of Receiver and Agreed Order" was entered on January 26, 2009. This report set forth the receiver's conclusions that MBI's assets were "worth more to certain of the Parties than they would be worth to anyone else" and that "the value of the Grease Business in its present operating posture appears to exceed any value that could be derived from its sale to a third party." This order incorporated a plan for liquidation of the assets providing that MBI's assets would be divided into two groups – one consisting of the grease business assets, and the other consisting of certain real estate owned by MBI that is not at issue on appeal. Under the order, the shareholders would have an opportunity to submit "offers to purchase" either or both classes of assets, and the assets would be sold to the highest bidder. The sale would "be 'as is, where is' with no guarantees and/or warranties of any sort whatsoever." After the resolution of creditors' claims, the receiver would distribute the sale proceeds to the shareholders pro rata.

On February 23, 2009, Louis placed a bid for the grease business assets of $360,000

plus an amount equal to the cash in the company on a dollar-for-dollar basis.[5] Louis had been primarily responsible for running the grease business for many years. The three defendant siblings, Stephen, Anita, and Linda, placed a bid of $758,000 for the grease business assets. Thereafter, Louis decided not to place a second bid. Instead, he decided to open his own grease business. On March 5, 2009, a charter of incorporation was filed for L.A. McRedmond, Incorporated ("LAMI"). Louis opened a bank account for his new business on March 24. Also in March, Louis began buying equipment such as semi tanker trailers (with personal funds), and he had them delivered to the MBI grease plant, where they were parked on the property. He discussed his plans for his new business with two MBI employees and asked them to work for his new company.

Meanwhile, on March 29, 2009, the receiver notified Stephen, Anita, and Linda that they were the successful bidders for the grease business assets. On April 1, 2009, the trial court entered an order approving the receiver's sale of the assets with an attached "Asset Purchase Agreement." The order authorized the receiver to close the sale of the company assets pursuant to the asset purchase agreement. Relevant to this appeal, the order further provided:

> Prior to sale, the current officers and directors of the Grease Business Assets being sold shall comply with the following requirements.
>
> 1. Conduct the Business only in the usual, regular and ordinary course, preserve the organizational structure of the Business, and preserve intact for the Buyer the goodwill of the Business and the present relationship between the Business and the employees, suppliers, clients, customers and others having business relations with the Seller;
>
> . . . .
>
> 4. Take all action and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by the agreement of the Buyer to purchase the Business; . . . .

The attached "Asset Purchase Agreement" referred to the receiver as the "Seller" and referred to Stephen, Anita, and Linda as the "Buyers." It stated that "[t]he Receiver has accepted the offer of the Buyers, under the terms of the Plan of Liquidation, for the purchase of both Asset Groups." The agreement further provided that the "Buyers or their designee(s)" agreed to purchase from the receiver, and the receiver likewise agreed "to sell, transfer, convey, and deliver to Buyers or their Designee(s)," all of the receiver's right, title

---

[5]The record is not clear how much cash the company had on hand at this point, but as of April 7 it had $87,554 in cash.

and interest in the grease business assets.  The asset purchase agreement scheduled the closing of the sale for April 8, 2009.

Prior to the sale closing, the three purchasing siblings, Stephen, Anita, and Linda, formed a new corporation called McRedmond Feed Company, Incorporated.  On the date of the closing, April 8, 2009, Stephen, Anita, and Linda executed a document entitled "Designation," which stated, in relevant part:

> The undersigned, as the Buyers under that certain Asset Purchase Agreement dated March 25, 2009 ("Agreement"), between the Buyers and Samuel K. Crocker, Receiver, as seller, hereby assign the right to and designate the following entities to purchase the assets described in the Agreement:
> . . . .
> McRedmond Feed Company, Inc., a Tennessee corporation, is named the Buyers' designee for purposes of purchasing the assets identified in the Agreement as the Grease Business.
> This Designation is executed and effective on April 8th, 2009.

That same date, the receiver executed a "Bill of Sale and Assignment" that contained the following relevant provisions:

> THIS BILL OF SALE AND ASSIGNMENT ("Bill of Sale") is executed as of April 8th 2009, by Samuel K. Crocker, Receiver for McRedmond Brothers, Incorporated, by Order of the Chancery Court of Davidson County . . . pursuant to the Asset Purchase Agreement [("the] Agreement") among the Assignor, and Edward Stephen McRedmond, Anita Sheridan, and Linda Orsagh, or their designee (the "Purchasers"), and is subject to all of the terms and conditions thereof.  The Purchasers have assigned all of their rights and responsibilities under the Agreement with regard to the purchase of the Grease Business Assets to McRedmond Feed Company, Inc., a Tennessee corporation (the "Assignee"). . . .
> Assignor does hereby assign, transfer, and convey to the above named Assignee, its successors and assigns forever, all of the Receiver's right, title and interest in the property to be purchased by the Assignee pursuant to the Agreement, identified therein as the Grease Business, exclusive of any interest in real property which is being transferred by a separate document, and including without limitation, the name of "McRedmond Brothers, Inc.," or any close derivation thereof.  Assignor hereby represents and warrants that Assignor has good right and lawful authority to bargain and sell the Grease

Business Assets, but makes no other representation or warranty, with respect to the state of the title of the property transferred hereunder. All such assets are transferred "AS IS, WHERE IS."

. . . .

This Bill of Sale shall be binding upon and inure to the benefit of Assignor and Assignee and their successors and assigns.

Another document entitled "Acknowledgment of Receipt of Transferred Assets" provided, "Assignee hereby acknowledges receipt of the above described assets, all as of this date." It was signed by Stephen on behalf of McRedmond Feed Company, Inc. At some point shortly thereafter, the dissolved MBI changed its corporate name from McRedmond Brothers, Incorporated to McRedmond Dissolution Corporation so that the newly formed McRedmond Feed Company, Inc. could change its name to McRedmond Brothers, Incorporated and do business using that name.

On the afternoon of April 8, 2009, after the sale closed, Louis sent notice to the receiver of his resignation as an employee, officer, and director of MBI. His new corporation, LAMI, held its first organizational meeting later that afternoon. Louis and his six co-plaintiff sisters were the shareholders of LAMI, and two of those sisters were elected to serve with him on the board of directors. By April 9, LAMI was actively operating a grease business in direct competition with MBI, targeting the same vendors that sold grease to MBI and also the customers that bought grease from MBI. Louis and LAMI's other employees began using the grease plant historically used by MBI. They parked LAMI's semi trailers at the docks customarily used by MBI and used the inside of the facility as well.

On April 23, 2009, Stephen, Anita, and Linda, acting jointly but in their individual capacities, filed a motion for temporary injunction and request for an expedited hearing. They asked the trial court to enjoin Louis from operating a competing business "on or about" the grease plant facility, and they requested an order requiring his "business" to vacate the facility occupied by MBI. They also sought an order prohibiting Louis from contacting MBI employees or otherwise interfering with MBI's business operations. According to the motion, Louis's attorney had confirmed that he was "the 'President, director and majority shareholder' of the competing business activities subject of this Motion," but his attorney would not confirm whether any other plaintiffs were "involved in the ownership, direction, and operation of the offending business." Accordingly, the motion sought such relief against Louis "and any such other and further of Plaintiffs . . . acting in concert therewith[.]" However, LAMI was not made a party to the proceeding.

In response, Louis argued that the motion for temporary injunction should be denied because the movants could not demonstrate that their rights were being violated within the

meaning of Tennessee Rule of Civil Procedure 65.04. Louis noted that he was a joint owner of the real property, that MBI had no lease on the property, and that the asset sale did not include a non-compete agreement. As such, he claimed that the movants had no legal right to exclude him or his company from the property that he owned as tenant in common.

Both sides filed affidavits in support of their respective positions. After a non-evidentiary hearing, the trial court entered an order granting the motion for temporary injunction on May 14, 2009. The injunction prohibited Louis "and any entity or individual that he controls, or any entity or any individual that is cooperating with him," from operating a grease business at the grease plant facility or interfering in any way with the operations of MBI on the premises. The order provided:

> The Court finds that prior to April 8, 2009 [the date of closing], [MBI] was free to operate the grease business with no competition or interference on the premises. The purpose of this Order is to preserve the status quo as it existed on April 8, 2009, and give the Defendants the benefit of their bargain. The Court further finds that, given the small number of customers and the small number of vendors of [MBI], the Court's intervention is needed to prevent irreparable harm.
> Nothing in this order, however, shall be construed to prevent Louis A. McRedmond, from operating a grease business at some other site if he chooses to do that.

In July 2009, Stephen, Anita, and Linda were granted leave to amend their answers to the original complaint for declaratory judgment in order to assert counterclaims against Louis and any other plaintiffs acting in concert with him.[6] Stephen, Anita, and Linda alleged that Louis and the other sisters had intentionally and maliciously interfered with their rights and business relationships and also breached their fiduciary duties to MBI. The specific "intentional and malicious acts" allegedly committed by Louis and his sisters included:

a.  Setting up and operating a competing business, [LAMI], on the same property where [MBI] operates the Grease Business;
b.  Attempting to lure [MBI's] employees to [LAMI] and directing [MBI] employees to perform work for the benefit of [LAMI];
c.  Commandeering the use of [MBI]'s loading/unloading docks, and blocking [MBI]'s trailers;
d.  Damaging the relationship between [MBI] and its suppliers and

---

[6]Stephen and his sisters separately filed the aforementioned counterclaims, but the substantive content of the counterclaims was substantially the same, and they contained nearly identical language.

customers;

e.      Otherwise operating [LAMI] in a manner calculated to inhibit, impair, annoy, and interfere with [MBI]; and

f.      Misuse of corporate assets in breach of Louis Anthony McRedmond's fiduciary duties.

In sum, the counterclaims alleged that Louis and his sisters had taken steps "to sabotage the going concern purchased by the Defendants." The counterclaims asserted that Stephen, Anita, and Linda were "the successful bidders on the sale" of the grease business assets and paid the purchase price for the assets. They also noted that the trial court's April 1, 2009 order "approv[ed] the sale" to Stephen, Anita, and Linda. The counterclaims mentioned that Stephen, Anita, and Linda "set up a new corporation[,] which became McRedmond Brothers, Inc., to operate the 'Grease Business.'" However, neither MBI nor McRedmond Feed Company, Inc. was a party to the counterclaims. Likewise, LAMI was not named as a defendant. The counterclaims simply noted that Louis was the principal of LAMI and that it was unclear whether the other six sisters were "officers, directors, agents, or otherwise acting in concert with the same." Therefore, the counterclaim stated, all of the original plaintiffs (Louis and his six sisters) were named as defendants "so that all proper parties are before the Court in this counterclaim." The counterclaims sought an unspecified amount of compensatory damages "in an amount to be proved at trial," in addition to punitive damages and a permanent injunction against Louis and the six counter-defendant sisters.

The case was set for trial for April 4-8, 2011. On March 28, 2011, the trial court entered an order sua sponte continuing the trial until further notice. On April 5, 2011, Louis filed a suggestion of death stating that Stephen died on March 28, 2011. An agreed order was entered thereafter, substituting Stephen's estate as the party in these proceedings. The case was reset for trial in December 2011.

In their pre-trial briefs, Louis and the six counter-defendant sisters argued that the counterclaims asserted by Stephen, Anita, and Linda were fatally flawed for two reasons – neither MBI nor McRedmond Feed Company, Inc. was named as a party plaintiff; and LAMI was not named as a defendant. Louis and the six counter-defendant sisters claimed that any damages that were allegedly suffered in this case were suffered by the corporate entity that was designated to receive the grease business assets and that owned and operated the grease business since the sale. They likewise claimed that Louis was acting in a "corporate capacity" in competing with MBI, and therefore, he could not be liable for LAMI's actions without some basis for piercing the corporate veil.

A three-day bench trial was held in December 2011.[7]  At the beginning of the proceedings, counsel for the corporation formerly known as MBI, which had been the subject of the receivership and dissolution proceedings, addressed the trial judge.  He informed the court that the former MBI was "[f]or all practical purposes" a defunct corporation but that it had been copied on all of the pleadings in this matter apparently due to the consolidation of this case with the case MBI had filed against the ten shareholders.  Counsel for MBI stated that MBI was "neutral in respect to the result" in this case, and he sought permission or guidance from the trial judge confirming that MBI was not required to participate in the trial. None of the attorneys objected, and the proceedings continued without further participation by counsel for MBI.

During opening statements, one of the attorneys representing Anita and Linda stated that his clients were  at a disadvantage because they were required to proceed to trial without their "best witness," their brother Stephen.  Counsel stated that Stephen had been murdered one week before the case was originally set for trial and the day before he was scheduled to give his deposition in this case.  He added, "they murdered him."  Counsel suggested that the trial judge should "Google" Stephen's name and read stories written about him since his death.  The trial judge responded, "I probably shouldn't do that."  Counsel continued with his discussion of the McRedmond family's history, without any objection by opposing counsel.  However, when Louis's attorney made an opening statement, he suggested that the comments about murder were "highly inappropriate."  Still, during the trial, several questions were asked about circumstances before and after Stephen "was murdered."  Louis's attorney did not formally object to these questions, but he complained during closing argument about "the constant references to Stephen McRedmond's murder" and asked the court to decide the issues on the merits rather than sympathy.

Most of the facts pertinent to this appeal were undisputed at trial.[8]  The receiver, Mr. Crocker, testified about his involvement with MBI and his sale of its assets.  He discussed the "Designation" executed at the closing of the sale, which he described as "the designation of the ultimate buyers under the asset purchase agreement."  In other words, according to the receiver, the Designation named McRedmond Feed Company, Incorporated as the entity "that would actually purchase the assets."  The receiver testified that the check for the

---

[7]Prior to trial, the three counter-plaintiffs announced that they were not seeking compensatory or punitive damages against five of the six counter-defendant sisters; they only sought damages from Louis and his co-defendant sister Stephanie.  However, they continued to seek a permanent injunction against Louis and all six counter-defendant sisters.

[8]Apparently due to the protracted procedural history of this case, the parties had been deposed several times.  The attorneys read into evidence lengthy excerpts from numerous depositions.  Louis was deposed at least four times, and he also testified at trial.

purchase of the assets was drawn on the trust account of the law firm representing Anita and Linda.

Louis testified that he had worked for MBI "[p]retty much all [his] life" and full-time for nearly forty years. The grease plant was located about a hundred yards away from his house. He had served as president of MBI and was responsible for "running" the grease plant. His duties included buying and selling the grease product, testing it, and directing employees on blending each particular load according to customer specifications. He also coordinated deliveries, routed the company's truck drivers, and did some mechanical work on the company's many tanker trucks. Stephen and Anita also worked in the MBI office for several years.[9] However, Stephen was primarily responsible for the real estate development owned by MBI, which is not at issue on appeal.

Prior to the asset sale, MBI regularly did business with four or five vendors, or grease suppliers, and it generally sold grease to four or five customers. Louis testified that the largest grease supplier, which he referred to as "Darling," was located in Georgia, and he said MBI could purchase "as many loads from Darling as we wanted[.]" He testified that he usually purchased grease "the week before" it needed to be delivered to the plant, but if he was "short" on inventory he could sometimes call a vendor and get a load the next day. Similarly, Louis generally scheduled shipments of grease "to go out" the following week. MBI's biggest customer was Tyson Foods, Inc. ("Tyson"), and sales to Tyson accounted for sixty-five to seventy percent of MBI's business. Tyson generally ordered four to six loads of grease per week, on Thursdays, to be delivered the following week. MBI's next largest customer was Tosh Farms.

Louis testified that he started LAMI because MBI had been sold and he needed a job. He acknowledged his intention was for LAMI to buy from the same vendors and sell to the same customers with whom MBI transacted business. Louis testified that he planned to operate from the grease plant on the family farm because he was an owner of the property. He intended to "hook up" his equipment inside the grease plant and establish an office in the same building that housed the MBI office. After entry of the temporary injunction in May 2009, however, LAMI began renting and operating from an offsite location. LAMI was still operating from that location at the time of trial in December 2011.

Louis admittedly took several steps to prepare to compete with MBI prior to the

---

[9]At least two of the plaintiff sisters aligned with Louis also worked at MBI for brief periods. Overall, however, it appears that the six counter-defendant sisters had limited involvement with the company. Anita testified about her history of working at MBI and said that two of the other sisters worked there for "a while," but she added, "[b]asically it was Louie, Stephen, and myself."

closing of the asset sale on April 8, 2009. In March 2009, LAMI was incorporated, and Louis began buying equipment that would be used by LAMI after the sale. Louis conceded that he used MBI employees and MBI equipment in order to have two tanker trailers brought to the MBI plant, for later use by LAMI. Specifically, on two occasions, Louis directed an MBI employee to use an MBI tractor truck to bring a tank trailer from Clarksville to the grease plant in Nashville. Louis admitted that he did not offer to reimburse MBI for using its employees or equipment.

Louis testified that he fully and completely performed his duties for MBI, in good faith, until he resigned on the date of the asset sale, which was Wednesday, April 8, 2009. He was in contact with Tyson and Tosh Farms the week before the sale and scheduled deliveries from MBI to Tyson and Tosh Farms for the week of the sale, as usual. When he spoke with his contact from Tyson on Thursday, April 9, the day after the sale, he informed her that MBI's assets had been sold, that he had started a new company, and that he would like to sell grease to Tyson via his new company. Louis's contact at Tyson informed him that LAMI would first have to take steps to become an approved vendor, so LAMI was not immediately able to sell grease to Tyson. Louis also contacted Tosh Farms on the day after the sale, and Tosh Farms bought a load of grease from LAMI that day. Louis had previously told his contact at Tosh Farms about the fact that he and Stephen were "splitting up." He said he informed his contact that he and Stephen would both be in the grease business and that he would like to sell grease to Tosh Farms. He said this conversation occurred either on the date of closing or the day before closing. Louis told at least one supplier, prior to closing, that he was unsuccessful in his bid for MBI and he would be starting his own company. One of the sisters aligned with Louis, who was employed by LAMI, testified that she witnessed Louis call an MBI customer on the date of closing, after he confirmed that the sale was final, and inform the customer that MBI was "[g]oing out of business," that he was opening a new grease business, and that he would like the customer to consider doing business with him. When asked about this, Louis claimed that he told customers that MBI's assets were sold, so the "old" MBI had closed, but the company would still be called MBI and it would be operated by his brother. Louis said he told customers that they were free to buy from either company.

Louis admitted that on the day he resigned, the level of inventory in the MBI storage tanks was lower than it had been in the past ten years. He said he bought enough inventory to cover the sales he made before he resigned, to be delivered during the week of the closing. However, he did not schedule any loads of inventory to be delivered to MBI after the date of the closing, and he did not sell any loads to customers for delivery beyond the week of the closing. Louis purchased at least one load of grease for his new company prior to the closing date. He bought several more loads of grease for inventory for his new company on the afternoon of April 8, after the sale, and the following day.

-12-

According to Louis, he did not actually *sell* any loads of grease to customers until after the asset sale closed on April 8, 2009. LAMI began selling grease to Tyson on April 24, 2009, approximately two weeks after the sale closed, and it continued to do so at the time of trial. The "vast majority" of LAMI's business was attributable to selling grease to Tyson.

MBI's accountant testified in detail about the company's financial data, including its gross sales and gross profits, both before and after the asset sale.[10] In 2007, the "old" MBI had $224,397 in taxable income, approximately $7.2 million in gross sales, and about $1.4 million in gross profits. In 2008, MBI had $123,943 in taxable income, about $6.5 million in gross sales, and approximately $1.3 million in gross profits. Again, the asset sale took place in April 2009. From April to December of 2009, the "new" MBI had no taxable income and suffered a loss of $318,776; it had gross sales of about $2.1 million, and gross profits of around $236,000. In 2010, the new MBI had a loss of $326,326, gross sales of approximately $4.8 million, and gross profits of about $569,000.

Anita and Linda testified that they could not recall how they and Stephen decided on the amount of their bid of $758,000 for the grease business assets. Anita worked in the MBI office in the past, but at the time of the sale, she was employed at an accounting firm doing office work. Linda lived in Atlanta and worked in the medical field; she had never worked at MBI. Anita said she envisioned the company operating in the same manner on the day after the sale as it had on the day before the sale, using the same suppliers, selling to the same customers, and operating with the same employees, with some exceptions. She suspected that Louis would open his own grease business, and she knew that at least one MBI employee would probably leave to work for Louis's new company. Anita said she informed MBI's employees, at some point, that she and Stephen were buying the company and that Louis "was probably going to go out on his own." Anita did not recall having any conversations with Stephen or Linda prior to closing about how they intended to operate the grease business after the sale. They had discussed the idea of trying to hire Louis to work for them, but they never attempted to do so. She was aware that MBI had no employment contracts with employees, no lease on the premises where it operated, and no covenant against competition after the sale. Anita said that she and Stephen answered telephone calls from MBI's customers when they worked in MBI's office in the past, and although Louis always had "the final say" as to the price, she believed that she and Stephen could "step in" and continue operating the business as usual.

_____

[10]The accountant also testified that the new MBI was a subchapter-S corporation. She said that there is a difference between a C corporation and an S corporation "[f]rom a tax return perspective," because a C corporation's income is taxed at the corporate level, but in an S corporation, "the income flows through to the shareholders and is taxed on their individual returns."

After the April 8 closing date, Anita returned to work at MBI on April 9 or 10. She became primarily responsible for buying and selling grease, with help from Stephen and other employees. Anita said she discovered that there was very little inventory, no incoming deliveries, and few outgoing orders. She said, "there were a few loads that had already been scheduled that were going to come in that week, but there was no plan ahead. I mean, we had to really start getting on the phone and trying to get some business in there." She described the company as "paralyzed." Anita acknowledged that it was customary to buy inventory one week in advance and to schedule sales one week in advance. She testified that any incoming loads after the sale were sold to customers, rather than sent to inventory storage tanks, so it took four to six weeks to replenish MBI's inventory to sufficient levels. Anita said she attempted to contact Tyson after the sale, but her telephone calls were not returned for four to six weeks. By the time of trial, the "new" MBI was doing business with about 25 suppliers and 12 to 15 customers, including Tyson and Tosh Farms. However, according to Anita, these were mostly smaller suppliers and customers and smaller loads of grease. In addition, Tyson had not purchased any loads of grease from the new MBI for its plant located in Tennessee, as it had in the past. Instead, MBI was supplying grease to a Tyson plant in Kentucky at a greater cost to MBI. Meanwhile, LAMI was supplying grease to the Tyson plant in Tennessee. An invoice from Tyson was mistakenly sent to MBI, but addressed to LAMI, and it indicated that Tyson was buying grease from LAMI at a higher price than MBI had offered to sell grease to Tyson.

At the close of the counter-plaintiffs' proof, Louis and the other counter-defendants orally moved for involuntary dismissal pursuant to Tennessee Rule of Civil Procedure 41. Among other things, they argued that the proper parties were not before the court. They reiterated that the company that purchased the grease business assets on April 8, 2009 was the corporate entity then designated as McRedmond Feed Company, Inc., and that same corporate entity had operated the grease business since the date of closing. They argued that if anyone had suffered damages in this case, it was the corporate entity, and the shareholders could not file a direct action to recover damages suffered by the corporate entity. In addition, Louis and the counter-defendants argued that their actions that allegedly constituted wrongful competition were taken as employees and officers of LAMI, and as a result, the counter-plaintiffs sued the wrong parties.

In response, counsel for Anita and Linda argued that the use of the corporate entity as a "vehicle" to take the assets was irrelevant and did not affect the nature of the sale. He also argued that Louis and his co-defendants waived their right to complain about this issue because they did not plead failure to join an indispensable party as an affirmative defense. Counsel for Stephen's estate also argued that the three individual siblings had suffered the loss because they paid the purchase price for the assets and "didn't get what they bargained for." He also pointed out that McRedmond Feed Company or the so-called "new" MBI was

a subchapter S corporation and suggested that this fact would impact the analysis. After these arguments, the trial court declined to rule on the motion for involuntary dismissal and reserved its ruling until the close of the proof.

The parties concluded their proof on December 12, 2011. The trial court entered its written order on July 3, 2013. The order described the lengthy procedural history of this case and stated,

> When these disputes appeared close to resolution in April 2009 through a court-supervised dissolution and liquidation process that allowed three of the siblings to buy the "going concern" assets of the family business from a court-appointed receiver, one of the brothers, with help from one or more of his sisters, started a competing business on the same premises that had housed the family business for more than fifty years one day after the sale, eventually taking with him the family business' largest customer.

In a footnote, the court found "the argument by the Sister-Defendants and others that [LAMI] and (new) [MBI] were required to be added as parties is without merit. The Buyers were damaged when they, as individuals, paid $758,000.00 for the grease business on April 8, 2009[.]" The order summarized the basic position taken by Anita, Linda, and Stephen's estate at trial as being

> that they had lost the benefit of their bargain by virtue of [Louis's] conduct in failing to maintain the business inventory, failing to perform his work with fidelity and in the ordinary course of business, and by taking their largest customer, allegedly in violation of the April 1, 2009 Order approving the sale of the business and allegedly in violation of [Louis's] fiduciary duty as an officer and director of [MBI], the corporation that operated the family business."

Relevant to this appeal, the court set forth the following remedies that were being sought by "the Buyers," meaning Anita, Linda, and Stephen's estate:

> 1) a permanent injunction preventing [LAMI] from operating a grease business from the Massman Drive property and affording related relief;
> 2) a declaration that [Louis] and [Stephanie] violated the Orders of the Court, including the Order of April 1, 2009;

3) a judgment on the claim that [Louis], [Stephanie], and [LAMI][11] intentionally interfered with the Buyers' business relationship;
4) judgment against [Louis] for breaching his fiduciary duty to [MBI]; [and]
5) a judgment for punitive damages against [Louis] and [Stephanie].

The court granted in part and denied in part the requested relief. It made the following findings relevant to the issues on appeal:

The evidence at trial demonstrated that [Louis] intentionally took steps to deplete the inventory of the grease business prior to the sale and to set up a competing business on the same premises as [MBI]. Under the Court's Orders of September 22, 2008 and April 1, 2009, [Louis] had a duty to preserve the good will and the relationship between the employees, suppliers, clients, customers and others having a relation with the grease business. [Louis] violated this duty directly and indirectly, and through the corporation he formed, LAMI – by competing with the grease business sold to his buyer-siblings and by intentionally depleting the inventory leading up to the sale of the "going concern" assets. . . .

The Court concludes that [Louis's] conduct in intentionally depleting the inventory of his family's grease business was contrary to the September 22, 2008 and the April 1, 2009 Orders of the Court and violated his fiduciary duty to exercise the highest degree of loyalty to [MBI]. His conduct in recruiting valuable employees away from his family's business, although the employees did not have a legal duty to stay with the business after it was sold, buttresses the Court's conclusion that [Louis's] conduct was intentional and violative of his duty to [MBI], and to his duty follow [sic] the Court Orders of September 22, 2008 and April 1, 2009. [Louis's] conduct in soliciting the business of Tyson Foods, [MBI's] largest client, also violated [Louis's] fiduciary duty to [MBI]. Obviously, the Buyers have sustained actual damages from this intentional conduct that operated to circumvent the Orders of the Court and the joint liquidation process agreed upon by the parties. The fact that [Louis] used a corporation to do indirectly what he could not do directly leading up to the sale on April 8, 2009 does not absolve him of his legal responsibility to follow the Orders entered by the Court.

The Buyers are claiming that the conduct of [Louis] amounted to intentional interference with business relations. In Tennessee, the party seeking relief for this tort must demonstrate: 1) an existing or prospective

_____

[11]The court noted in a footnote that "[t]he corporate entity, L. A. McRedmond, Inc., was never made a party in these consolidated cases."

business relationship with specific or identifiable third persons; 2) that the alleged interfering party knew of the existing or prospective business relationship; 3) that this party intended to cause a breach or termination of the business relationship or business prospect; 4) that the interfering party used improper motive or means; and 5) the party seeking relief suffered damages. *See Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Here, the Court concludes that [Louis] engaged in conduct that constitutes intentional interference with business relations. [Louis] knew of the sale of the impending grease business [sic] and intentionally interfered with this business prospect by the improper conduct outlined above, including the breach of fiduciary duty to [MBI], his obligation to abide by the orders of the Court, and the implied covenant of good faith and fair dealing implicit in every contract. See *Wallace v. National Bank of Commerce*, 938 S.W,2d 684, 686 (Tenn. 1996).

. . . .

. . . . Here, the Buyers did not receive what they bargained for in purchasing the "going concern" assets of the grease business for $758,000.00.

Given [Louis's] intentional conduct in depleting the inventory, his conduct in recruiting the grease business' biggest customer, and his conduct in diverting his attention from [MBI] to take steps to start a competing business on the same business property, it appears to the Court that the Buyers received approximately half of what they bargained for, something that was much closer in value to [Louis's] bid of $360,000.00. [Louis] made this offer of $360,000.00 on February 23, 2009, before he had fully positioned himself to take the Tyson contact from his family's grease business. In making this offer, however, he was aware that he intended to engage in conduct that this Court now concludes amounted to self-dealing, usurpation of (Old) [MBI's] corporate opportunities, breach of his fiduciary duties, and violation of the orders of the Court. The Court, therefore, awards the Buyers compensatory damages in the aggregate amount of $375,000.00. The grease business, because of [Louis's] wrongful conduct, had a diminished ability to service, and hold on to, its customers (including Tyson, which was approximately 65% of the business of [MBI]) when the Buyers paid for the grease business.

The court stated that it "merge[d] all the damages for violating the Court's Orders, intentional interference with business relations, and breach of fiduciary duties into the aggregate compensatory damages award of $375,000.00." Specifically, the court awarded $125,000 to each of the three individual counter-plaintiffs, Anita, Linda, and Stephen's estate, "for Louis A. McRedmond's conduct in violating the Agreed Orders of the Court and in violating his fiduciary duty to [MBI]."

In addition, the trial court made its temporary injunction permanent in all respects. The court found that "the parties should not attempt to operate competing businesses on the same property in light of the difficulties that it would pose," and it also noted that the grandfathered zoning right to operate the grease business was sold via the asset sale.

The court declined to award punitive damages because it concluded that Louis was acting "under a colorable claim of right." The court dismissed the claims against the six counter-defendant sisters in all respects. The trial court designated the order as final pursuant to Tennessee Rule of Civil Procedure 54.02. Louis filed a motion to alter or amend, which the trial court denied. He then timely filed a notice of appeal to this Court.

## II.   ISSUES PRESENTED

Louis presents the following issues, which we have slightly restated, for review on appeal:

1.      Whether the proper parties were before the court;

2.      Whether the trial court committed reversible error by considering matters outside the evidence, particularly with regard to Stephen's alleged murder, in rendering its decision;

3.      Whether the trial court erred in finding that Louis's pre-closing preparations to compete were improper;

4.      Whether the trial court erred in holding that Louis engaged in conduct that constituted intentional interference with business relations;

5.      Whether the trial court applied an incorrect legal standard for calculating damages; and

6.      Whether the trial court erred in ordering a permanent injunction.

Anita, Linda, and Stephen's estate have responded to each of these issues in their posture as appellees, and they also present the following issues for review on appeal:

7.      Whether Louis's judicial admissions conclusively establish the appellees as the proper party counter-plaintiffs; and

8.      Whether Louis waived his right to challenge the appellees' standing by

raising the issue for the first time in his pre-trial brief.

For the following reasons, we reverse the decision of the chancery court, vacate the injunction, and dismiss the counterclaim.

### III. DISCUSSION

### *A. Standing*

We begin with Louis's assertion that the three individual counter-plaintiffs – Anita, Linda, and Stephen's estate – had no right to recover damages in this case because they have never owned or operated the grease business; they are shareholders of the corporation that owns and operates the business. Louis argues that the claims asserted belong to the corporate entities, not to the individual shareholders.

The question of standing is an issue of law, which we review *de novo*. *In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013) (citing *Cox v. Shell Oil Co.*, 196 S.W.3d 747, 758 (Tenn. Ct. App. 2005)). "Standing is a judge-made doctrine based on the idea that '[a] court may and properly should refuse to entertain an action at the instance of one whose rights have not been invaded or infringed.'" *Cox*, 196 S.W.3d at 758 (citing 59 Am.Jur.2d *Parties* § 30 (1987)). The primary focus of the standing inquiry is on the party, not on the merits of the claims asserted. *Id.*

"Under Tennessee corporation law, a corporation and its shareholders are distinct entities." *Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 790 (Tenn. 2006) (citing *Hadden v. City of Gatlinburg*, 746 S.W.2d 687, 689 (Tenn. 1988); *Gen. Tel. Co. v. Boyd*, 208 Tenn. 24, 343 S.W.2d 872, 875 (1960)). Consequently, "we respect the separate legal status of a corporation and its shareholders." *Id.* "Even if one stockholder holds all of the stock in a corporation, the corporation and that single stockholder remain 'distinct legal entities.'" *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 216 (Tenn. 2012) (quoting *Hadden*, 746 S.W.2d at 689). A closely-held corporation "is still a legal entity with a separate identity" from its majority shareholders. *S.E.A., Inc. v. Southside Leasing Co.*, No. E2000-00631-COA-R3-CV, 2000 WL 1449852, at *9 (Tenn. Ct. App. Sept. 29, 2000). Ownership of all of the capital stock of a corporation does not make the shareholder the owner of the corporation's property. *Vella v. National Pizza Co.*, No. 02A01-9311-CV-00254, 1994 WL 618606, at *3 (Tenn. Ct. App. Nov. 9, 1994) (citing *Hinton v. Carney*, 250 S.W.2d 364, 365 (Tenn. 1952)).

"The responsibility for managing a corporation's business and affairs falls on its officers and directors, not its shareholders." *Orlando Residence, Ltd. v. Nashville Lodging*

-19-

*Co.*, 213 S.W.3d 855, 863 (Tenn. Ct. App. 2006) (citing *Lewis on Behalf of Citizens Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215, 220 (Tenn. Ct. App. 1992)). The Tennessee Business Corporation Act provides that, "[u]nless its charter provides otherwise, every corporation . . . has the same powers as an individual to do all things necessary or convenient to carry out its business and affairs," including the power to "[s]ue and be sued, complain and defend in its corporate name." Tenn. Code Ann. § 48-13-102(1). Accordingly, "Tennessee courts have . . . held that even when a corporation has one sole shareholder, such shareholder still may not bring suit to right wrongs done to the corporation." *Orlando Residence, Ltd.*, 213 S.W.3d at 863 (citing *Hadden*, 746 S.W.2d at 689). "Rather, the responsibility of determining whether a corporation should pursue legal action lies with the corporation itself."[12] *Id.* (citing *Lewis*, 838 S.W.2d at 220). The general rule is that "the proper party to assert a corporate cause of action is the corporation itself[.]"[13] *Id.* at 863 n.4 (quoting *Lewis*, 838 S.W.2d at 221).

The Tennessee Supreme Court's decision in *Hadden v. City of Gatlinburg*, 746 S.W.2d 687 (Tenn. 1988) is instructive, and in fact, both sides relied on this case in support of their positions before the trial court. In *Hadden*, Mr. and Mrs. Hadden and their daughter formed a corporation to operate a restaurant on property they owned as individuals. *Id.* at 688. They leased the real property to the corporation. *Id.* Due to nearby construction by the City of Gatlinburg, the restaurant was rendered inaccessible for several months, and the Haddens sued the City for damages. *Id.* at 688-89. The case was tried as a temporary nuisance action. *Id.* at 689 n.1. On the day of trial, the City moved to dismiss the action on

---

[12]Some reasons "underlying the general rule requiring an action to be brought by the corporation, even when the shareholder dominates the corporation, are not only that such a single action will avoid a possible multiplicity of actions by various shareholders and will not act as a bar to a subsequent action by the corporation, but also that the damages so recovered may be available for the payment of the corporation's creditors as well as for distribution to the shareholder or shareholders." 12B *Fletcher Cyc. Corp.* § 5910.

[13]A shareholder derivative action is "a limited exception to the usual rule that the proper party to assert a corporate cause of action is the corporation itself[.]" *Franklin Capital Assocs., L.P. v. Almost Family, Inc.* 194 S.W.3d 392, 400 n.4 (Tenn. Ct. App. 2005). "A derivative action is an extraordinary, equitable remedy available to shareholders when a corporate cause of action is, for some reason, not pursued by the corporation itself." *Lewis*, 838 S.W.2d at 221. However, "[a]ll jurisdictions impose threshold preconditions on derivative suits in order to allow the directors to occupy their normal status as the conductors of the corporation's affairs, to encourage informal resolution of intracorporate disputes, and to guard against misuse of the derivative remedy." *Id.*; *see, e.g.*, Tenn. Code Ann. § 48-17-401(b) ("A complaint in a proceeding brought in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why the person did not make the demand."); Tenn. R. Civ. P. 23.06. In this case, the appellees do not suggest that this was a derivative suit, and the record reveals that they did not comply with the requirements for filing such a suit.

the grounds that the proper party, i.e., the corporation that operated the restaurant, was not before the court. *Id.* at 689. However, the trial court held that the individual plaintiffs were the proper parties because the business was a subchapter-S corporation that did not pay taxes, and therefore, the trial court determined, the losses belonged to the individuals. *Id.* The trial court awarded the Haddens $10,000 in damages. *Id.* at 688. On appeal, the City argued that the Haddens "sustained no damages in their own right, and [did] not have standing to bring suit to recover losses incurred by the [corporation] in the operation of the restaurant." *Id.* The supreme court agreed and found no basis for recovery by the Haddens. The court explained:

> A corporation and its stockholders are distinct legal entities even if all the stock in the corporation is owned by one stockholder. *See Parker v. Bethel Hotel Co.*, 96 Tenn. 252, 34 S.W. 209, 215 (1896). Even a stockholder who is the sole shareholder of a corporation may not bring a suit to right a wrong done to the corporation[.] *See Lockhart v. Moore*, 25 Tenn.App. 456, 159 S.W.2d 438, 443 (1941); 1 *Fletcher Cyclopedia of the Law of Private Corporations* § 36 (1983 rev.). Stockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer. *See Grogan v. Garner*, 806 F.2d 829, 834–836 (8th Cir.1986); *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893 (5th Cir.1968); *Martin v. Maldonado*, 572 P.2d 763, 773 (Alaska 1977).
>
> . . . .
>
> The record does show that the plaintiffs did not strictly recognize the corporation as an entity separate from themselves. The corporation was a closely held corporation and as a practical matter the injury sustained by the corporation directly affected the plaintiffs. But this fact does not entitle plaintiffs to bring a cause of action to recover damages sustained by the corporation, even where the corporation's status is that of a subchapter-S corporation under 26 U.S.C. § 1371. First, plaintiffs are not the sole stockholders of the subchapter-S corporation. But, more importantly, subchapter-S status pertains only to a corporation and shareholder's tax liability and does not affect the general law of corporations. *See R.S. Smero, Inc. v. Levine*, 51 A.D.2d 273, 381 N.Y.S.2d 337, 339 (1976); 4 Cavitch, *Business Organizations* § 77.01 et seq. (1987). *See also*, *Shelby County v. Barden*, 527 S.W.2d 124, 129–130 (1975), wherein this court pointed out that:
>
>> . . . [W]here parties have deliberately undertaken to do business in corporate form, for tax purposes, accounting and other reasons, they must be held to the corporate form and they cannot

shunt aside at their convenience legal entities and the legal aspects thereof. Thus it will simply not do for the landowners to state that they do not really care how damages are apportioned. The law itself requires apportionment between the lessor and the lessee where separate interests are taken or impaired by public improvements, and parties simply must conform their proof to the legal measures of damages prescribed, no matter how artificial or confining these rules may seem to be. The corporate tenant had been deliberately created, and it was paying rent, which it deducted upon its tax returns, and which was reported as income by the landowners. The burden of proof rested upon the corporate tenant to prove the damage to its access right, if any, by competent evidence based upon the difference between the rental required under the lease and the market value of the leasehold.

527 S.W.2d at 130.

The distinction between the corporate lessee and stockholder lessor was not observed in the present case. Although the majority of the Court of Appeals found individual injury to the plaintiffs in their own right as landlords and stockholders, the proof does not support the holding. The injury from the temporary nuisance was to the corporation, who was the lessee and operator of the restaurant.

*Id.* at 689-90.  In sum, because "[t]he injuries complained of were to the corporation's restaurant business," the individual shareholders, the Haddens, had no right to recover damages.[14]  *Id.* at 690.

In the case at bar, Louis similarly argues that Anita, Linda, and Stephen's estate

---

[14]Although both sides relied on *Hadden* in the trial court, Anita, Linda, and Stephen's estate argue on appeal that Louis's reliance on *Hadden* is "misplaced" because, they claim, the Sixth Circuit Court of Appeals "cast doubt" on the holding in *Hadden* in *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399 (2006).  In *McCarthy*, the Court expressed its opinion, in dicta, that if the Tennessee Supreme Court was presented with this issue again, it would "likely" adopt a new rule followed by Delaware courts "rather than adhering to its 1988 decision in *Hadden*."  However, the Court went on to say that resolution of that issue was not dispositive of the claims before the Court, and therefore, it did not address the issue further. Regardless of the Sixth Circuit's opinion about this issue, "we are bound to follow [Tennessee Supreme Court decisions] if they are on point." *Publix Super Markets, Inc. v. Tenn. Dep't of Labor & Workforce Dev.*, 402 S.W.3d 218, 230 (Tenn. Ct. App. 2012).  *Hadden* is on point and controls our decision.

sustained no damages in their own right and did not have standing to bring suit to recover losses incurred by the new MBI in the operation of the grease business. He points to the fact that the receiver conveyed the grease business assets directly to McRedmond Feed Company, Inc. on the date of closing, and the corporate entity, McRedmond Feed Company, Inc. and/or the new MBI, has operated the grease business exclusively since that date. At trial, Anita confirmed that the grease business had operated only "in a corporate capacity" since the date of closing. Thus, Louis claims that the counter-plaintiff shareholders are essentially seeking to recover "for harm purportedly done to the assets purchased by the corporation they own." Moreover, with regard to the counter-plaintiffs' claim for breach of fiduciary duty, Louis argues that he only owed such a duty to the old MBI, and possibly to the receiver, but in any event, he claims he was not liable to Anita, Linda, or Stephen's estate for breach of fiduciary duty.

A party's standing may hinge on the nature of the claims, so the standing inquiry requires us to engage in "a careful judicial examination" of the claims in order "'to ascertain whether the particular plaintiff[s] [were] entitled to an adjudication of the particular claims asserted.'" *Cox*, 196 S.W.3d at 758 (quoting *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984)). As stated above, the trial court combined the damages awarded to Anita, Linda, and Stephen's estate into one "aggregate" award "for violating the Court's Orders, intentional interference with business relations, and breach of fiduciary duties[.]" Specifically, the court found that Louis violated the court's orders to preserve MBI's goodwill and business relationships by recruiting MBI employees, "by competing with the grease business sold to his buyer-siblings and by intentionally depleting the inventory leading up to the sale of the 'going concern' assets." The court concluded that Louis engaged in conduct constituting intentional interference with business relations because he

> knew of the sale of the impending grease business [sic] and intentionally interfered with this business prospect by the improper conduct outlined above, including the breach of fiduciary duty to [MBI], his obligation to abide by the orders of the Court, and the implied covenant of good faith and fair dealing implicit in every contract.

The court found that Louis "violated his fiduciary duty to exercise the highest degree of loyalty to [MBI]" and determined that his conduct "amounted to self-dealing [and] usurpation of (Old) [MBI]'s corporate opportunities."

The court found that Louis's conduct had "[o]bviously" damaged "the Buyers." It concluded that the three individual siblings "were damaged when they, as individuals, paid $758,000.00 for the grease business on April 8, 2009[.]" The court found that "the Buyers did not receive what they bargained for in purchasing the 'going concern' assets of the grease

-23-

business for $758,000.00." According to the court, the grease business had a diminished ability to service its customers "when the Buyers paid for the grease business" due to Louis's wrongful conduct. Because of Louis's conduct, the court found, "the Buyers received approximately half of what they bargained for[.]"

We respectfully disagree with the trial court's conclusion that the three individual siblings can recover on the theory that they lost the benefit of their bargain. For whatever reason, the three individual siblings did not "close the deal" by purchasing the grease business assets in their individual capacity. We recognize that they placed a bid and made an offer to purchase the assets, and the trial court approved the sale of the assets to the three individuals, *or their designee*. However, the three individuals subsequently formed a new corporation, McRedmond Feed Company, Inc., and executed a "Designation" stating that they "assign[ed] the right to and designate[d] [McRedmond Feed Company, Inc., a Tennessee corporation] to purchase the assets[.]" The "Bill of Sale and Assignment" executed by the receiver expressly stated that Stephen, Anita, and Linda "*assigned all of their rights and responsibilities* under the Agreement with regard to the purchase of the Grease Business Assets to McRedmond Feed Company, Inc., a Tennessee corporation (the 'Assignee')." (Emphasis added.) Accordingly, the receiver conveyed the grease business assets directly to McRedmond Feed Company, Inc. Stephen signed an "Acknowledgment of Receipt of Transferred Assets" on behalf of McRedmond Feed Company, Inc., providing that McRedmond Feed Company, Inc. "acknowledge[d] receipt" of the grease business assets.

As the supreme court said in *Hadden*, "'[W]here parties have deliberately undertaken to do business in corporate form, for tax purposes, accounting and other reasons, they must be held to the corporate form and they cannot shunt aside at their convenience legal entities and the legal aspects thereof.'" 746 S.W.2d at 690 (quoting *Barden*, 527 S.W.2d at 129-130). Here, the parties' deliberate decision to utilize a corporation to purchase the assets cannot be overlooked or brushed aside simply by characterizing the corporation as a mere "vehicle" or "instrument" for completing the sale. McRedmond Feed Company, Inc. was a distinct legal entity, even if the three individuals owned all of its stock. Even sole shareholders may not bring suit to right wrongs done to a corporation because the responsibility for determining whether a corporation should pursue legal action lies with the corporation itself.[15] *Orlando Residence, Ltd.*, 213 S.W.3d at 863.

---

[15]We note, again, that the shareholders did not attempt to file a derivative suit on behalf of the corporation. "An action to redress injuries to a corporation, whether arising out of contract or tort, cannot be maintained by a stockholder in his own name but must be brought in the name of the corporation, the stockholder's rights being merely derivative and can be asserted only through the corporation." *Third Nat.*
(continued...)

In *Hadden*, our supreme court explained that "[s]tockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer." 746 S.W.2d at 689. From our review of the record, we conclude that the damages of which the counter-plaintiffs complain were sustained by the corporations involved in this case, not by Anita, Linda, or Stephen individually. We cannot discern an individual injury "done directly to" Anita, Linda, and Stephen in their own right because they have never, individually, owned or operated the grease business. The alleged injury resulting from Louis's alleged violation of court orders governing the conduct of MBI employees pending the sale was to the ultimate buyer of the grease business assets. Similarly, the party who was injured by the alleged interference with business relations, if Louis knew of the sale of the grease business and "intentionally interfered with this business prospect," was, again, the buyer of the assets.[16] In finding that the three individual siblings had standing to pursue these causes of action, the trial court relied on the fact that the individuals paid the purchase price for the assets. The check that was provided to the receiver was drawn on the trust account of the law firm representing Anita and Linda. Nevertheless, we do not find the issue of payment controlling. Regardless of who provided the funds that enabled McRedmond Feed Company, Inc. to purchase the assets, the fact remains that McRedmond Feed Company, Inc. purchased the assets. The three individuals assigned their right to purchase the assets and assigned all of their rights and responsibilities under the asset purchase agreement to McRedmond Feed Company, Inc. As a result, McRedmond Feed Company, Inc. received or did not receive the "benefit of the bargain," not Stephen, Anita, or Linda. The trial court found that "*the Buyers* did not receive what they bargained for in purchasing the 'going concern' assets" (emphasis added), but the three individuals were not the buyers. A distinct corporate entity is and always has been the owner and operator of the grease business. Even though, as in *Hadden*, the injury sustained by the corporation "directly affected" the individuals, "as a practical matter," "this fact does not entitle [the shareholders] to bring a cause of action to recover damages sustained by the corporation." 746 S.W.2d at 690.

We likewise conclude that neither Anita, Linda, nor Stephen's estate had standing to sue Louis for breach of the fiduciary duty he owed to the former MBI. The trial court found that Louis breached his fiduciary duty to MBI and usurped corporate opportunities belonging to the "old" MBI. However, claims for breach of fiduciary duty "must generally be brought

[15](...continued)
*Bank in Nashville v. Celebrate Yourself Productions, Inc.*, 807 S.W.2d 704, 707-708 (Tenn. Ct. App. 1990).

[16]The tort of intentional interference with business relationships requires the plaintiff to prove, among other things, "damages resulting from the tortious interference." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

as derivative actions because breaches of fiduciary duty are deemed to injure only the corporation." *Cato v. Mid-America Distribution Ctrs., Inc.*, No. 02A01-9406-CH-00149, 1996 WL 502500, at *6 (Tenn. Ct. App. Sept. 6, 1996) (citing *Bayberry Assoc. v. Jones*, 783 S.W.2d 553 (Tenn. 1990); *O'Neal's Close Corporations*, § 8.16 (1994)); *see also* 12B *Fletcher Cyc. Corp.* § 5909 ("In general, actions for breach of fiduciary duties are to be brought in derivative suits."). We find no injury directly to Anita, Linda or Stephen that was "distinct from that incurred by the corporation." *See Hadden*, 746 S.W.2d at 689.

On appeal, Anita, Linda, and Stephen's estate argue that the trial court was correct in awarding damages to them individually because "the evidence at trial was abundantly clear that [they] were purchasing the grease business assets as a going concern, and the tortious acts which operated to diminish the value of those assets occurred primarily before the newly formed corporation took possession of the assets[.]" For the reasons set forth above, we disagree with the assertion that the individuals were "the actual buyers" of the grease business assets, as they claim. It does not matter whether they originally intended to purchase the assets as individuals, or whether the asset purchase agreement referred to them as the "buyers."[17] Prior to closing, they assigned "all of their rights and responsibilities" under the asset purchase agreement to McRedmond Feed Company, Inc. We also find it irrelevant whether the tortious acts occurred primarily before or after the newly formed corporation took possession of the assets. The determinative fact is that the corporation took possession of the assets that were allegedly harmed, not the individuals.

Finally, we consider whether Anita, Linda, and Stephen had standing to seek an injunction preventing Louis from operating a grease business at the plant historically used by MBI. The motion for temporary injunction asked the trial court to enjoin Louis from interfering with MBI's business operations. It was accompanied by Stephen's affidavit, in which he stated that he, Anita, and Linda had recently purchased the going concern business of MBI and "believed that . . . our purchase would be of a going concern free from the intervention of a competing business on the business property." The motion alleged that Louis began operating a competing business at the same location shortly after the sale closed, and it claimed that MBI's operations were impaired by the operation of Louis's business. In particular, Stephen, Anita, and Linda alleged that Louis's business had operated in a manner that prevented ingress and egress from the MBI facility, blocked the company's single weigh scale, commandeered several loading docks, blocked access by MBI trailers, mixed flammable materials in a manner that endangered MBI employees, harassed MBI employees and attempted to lure them away from MBI, adopted a business name to confuse

---

[17]The three siblings also point out that the receiver, during his testimony, referred to them as the purchasers and said that the "Designation" did not "matter" to him or affect the nature of the business he sold. These facts do not control our analysis or alter the unequivocal terms of the closing documents.

customers and vendors about the identity of MBI, refused to return MBI property, attempted to establish an office at the MBI facility, and generally positioned his new business in a way that interfered with MBI's business. Stephen's affidavit concluded by stating, "Had we known that the competitor's actions would occur, we would not have purchased the business and certainly did not intend to purchase a business whose facility would be shackled to a direct competitor." A review of these allegations clearly demonstrates that Anita, Linda, and Stephen were again proceeding as if they had purchased the grease business as individuals, and they attempted to assert rights belonging to the corporation that actually did purchase, own, and operate the grease business. The trial court's temporary injunction, which was eventually made permanent, stated, "The Court finds that prior to April 8, 2009 [the closing date], [MBI] was free to operate the grease business with no competition or interference on the premises. The purpose of this Order is to preserve the status quo as it existed on April 8, 2009, and give the Defendants the benefit of their bargain."[18]

The granting of a temporary injunction is governed by Tennessee Rule of Civil Procedure 65.04(2), which provides:

> A temporary injunction may be granted during the pendency of an action if it is clearly shown by verified complaint, affidavit or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss or damage pending a final judgment in the action, or that the acts or omissions of the adverse party will tend to render such final judgment ineffectual.

"The most common description of the standard" for entering a temporary injunction, in federal and state courts, is the following four-factor test:

> (1) the threat of irreparable harm to plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on the defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest.

*Denver Area Meat Cutters & Employers Pension Plan ex rel. Clayton Homes, Inc. v. Clayton*, 120 S.W.3d 841, 857 (Tenn. Ct. App. 2003) (quoting *S. Cent. Tenn. R.R. Auth. v. Harakas*, 44 S.W.3d 912 (Tenn. Ct. App. 2000); Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 4–3(1) (1999)). In this case, Anita, Linda, and Stephen's estate

---

[18]The final order stated, "the Court hereby DECLARES the May 14, 2009 Temporary Injunction, which is attached and incorporated by reference as Exhibit 'A' to this Memorandum and Final Order, to now be, in all respects, permanent."

have failed to demonstrate that *their* rights were being violated by Louis's conduct or that *they* were threatened with irreparable harm. Once again, we find no direct injury to Anita, Linda or Stephen that was distinct from that incurred by MBI.[19]

In summary, we conclude that all of the claims asserted by Anita, Linda, and Stephen's estate attempt to recover for harm suffered by corporate entities. Thus, they lack standing to assert these claims.

## 1. Judicial Admissions

On appeal, Anita, Linda, and Stephen's estate argue that Louis's "judicial admissions conclusively establish Appellees as the proper party counter-plaintiffs." In their counterclaims, Anita, Linda, and Stephen alleged that they were "the successful bidders on the sale" of the grease business assets and that the trial court's April 1, 2009 order approved the sale of the assets to them. Louis admitted these allegations in his answer to the counterclaims. Anita, Linda, and Stephen's estate maintain that Louis's admissions "conclusively establish" them as the proper party counter-plaintiffs. We disagree. Louis simply admitted that Anita, Linda, and Stephen were the successful bidders and that the trial court approved the sale to them in its April 1 order. Admitting these undisputed facts did not change the fact that, after the sale was approved, and prior to closing, Anita, Linda, and Stephen assigned their rights and responsibilities under the asset purchase agreement to a separate corporation. Moreover, Louis's admissions did not conclusively establish that the three counter-plaintiffs were the proper parties to assert the causes of action set forth in the counterclaims.

## 2. Waiver

Anita, Linda, and Stephen's estate also argue that Louis waived his right to complain about the issue of standing because he did not raise "a standing/necessary party defense" in his answer to the counterclaims. Louis first attacked the counter-plaintiffs' standing in his

---

[19]We recognize that Stephen, at one time, had an interest in the real property as a tenant in common, and he transferred that interest to Linda. However, the motion for temporary injunction did not attempt to assert a right to injunctive relief arising out of ownership of the real property. Instead, Stephen, Anita, and Linda claimed that they were suffering damages as buyers of the grease business. Stephen's affidavit stated that he, Anita, and Linda "did not intend to purchase a business whose facility would be shackled to a direct competitor." Likewise, the injunction entered by the trial court was based on the petitioners' status as buyers of the grease business, expressly stating that its purpose was to "give the Defendants the benefit of their bargain." The order did not mention ownership rights to the real property. We express no opinion as to whether Linda would have standing to seek injunctive relief as a tenant in common with an ownership interest in the real property because such a claim was not asserted in this case.

pre-trial brief, and he raised the issue again in the context of a motion for involuntary dismissal at the close of the counter-plaintiffs' proof.

The Tennessee Supreme Court has described standing, and the method of raising the issue, as follows:

> Standing is a judge-made doctrine which has no per se recognition in the rules. It is used to refuse to determine the merits of a legal controversy irrespective of its correctness where the party advancing it is not properly situated to prosecute the action. An issue of standing is therefore raised by a specific denial or defense (but not an affirmative defense under Rule 8.03) in the answer or responsive pleading, or by a motion to dismiss under Rule 12.02(6) or in proper cases by a motion for judgment on the pleadings under Rule 12.03, or motion to strike under Rule 12.06.
>
> Where made by Rule 12.02(6) motion the issue must be framed on the face of the pleadings. If matters outside the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment under Rule 56. This is also true, with respect to a motion for judgment on the pleadings under Rule 12.03.

*Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976). Because "a challenge to standing is not an affirmative defense under Tenn. R. Civ. P. 8.03," the issue of standing "is not waived if it is not properly pleaded." *In re Estate of Smallman*, 398 S.W.3d 134, 163 (Tenn. 2013) (Koch, J., dissenting) (citing *Knierim*, 548 S.W.2d at 808). Thus, Louis did not waive his right to complain about the counter-plaintiffs' lack of standing, even though he raised the issue for the first time in his pre-trial brief.

## IV. CONCLUSION

For the aforementioned reasons, we reverse the decision of the chancery court, dismiss the counterclaim, and vacate the permanent injunction. All other issues raised on appeal are pretermitted. Costs of this appeal are taxed to the appellees, Anita Sheridan, Linda Orsagh, and the Estate of Edward Stephen McRedmond, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE